Fuld, J.
 

 The only important question posed by this appeal, one of first impression in this State, concerns the right of a plaintiff in a malpractice suit to call a doctor against whom she brought the action and question him as a medical expert.
 

 The plaintiff, Kathleen McDermott, was for many years aware that she was suffering in both eyes from some corneal disease and had, on a number of occasions, consulted with various physicians with reference to her condition and been advised of the possible merits of a corneal transplant. In August of 1957, she visited Dr. Schachat, an ophthalmologist, who examined her eyes and, in discussing such a transplant, allegedly stated that, even if the transplant was a complete failure, the plaintiff’s left eye would be “ [e]xactly the way it is now ” and,
 
 *22
 
 thus, she ‘ ‘ had everything to gain and positively nothing to lose ” by undergoing such an operation. Dr. Sehaehat, however, informed the plaintiff that he did not specialize in corneal transplants and he referred her to Dr. Patón, the physician in charge of the corneal clinic at the Manhattan Eye, Ear and Throat Hospital and, admittedly, one of the leading ophthalmologists in the world.
 

 The plaintiff was examined by Dr. Patón on October 3, 1957, and, according to her testimony, he apparently told her that, without an operation, she was “going to lose [her] sight”. Dr. Patón, called as a witness by the plaintiff, testified that he diagnosed the condition of the plaintiff’s eyes as “ Fuch’s dystrophy” — a rare ailment marked by progressive clouding of the cornea—that the disease “ extended pretty well to the periphery” of the cornea in each eye and that the plaintiff’s vision without glasses was 5/200 in each eye, her best corrected vision being 20/200. He recommended a “ curettement of the endothelium ”—which is a scraping of the back layer of the cornea—to be followed by a corneal transplant, both operations to be performed, in the first instance, on the plaintiff’s left, and worse, eye. About three weeks later, on October 22, the plaintiff entered Manhattan Eye, Ear and Throat for the express purpose of undergoing the recommended operations and, at such time, signed the standard admittance forms, which contained an authorization to operate. At the hospital, the plaintiff was visited, for the first time, by Dr. Kleinhandler who, declared the plaintiff, stated “ Positively, you cannot lose your sight in this operation ” and assured her, so she further testified, that, “ If the operation wasn’t a success, I would be just the way I was with my eye and vision and go about my business ”. On the following day, October 23, Dr. Kleinhandler performed the first stage of the operation, the curettement of the endothelium, with Dr. Patón in attendance and supervising. Thereafter, the second step, the actual corneal transplant in the left eye, was carried out by Kleinhandler, this time with Dr. Doctor supervising. And, finally, a third operation, to alleviate a secondary glaucoma, was performed by Dr. Patón himself. There is no dispute but that the operations were unsuccessful and the plaintiff rendered virtually blind in her left eye. At the same time, Dr. Patón’s testimony indicated that, contrary to any
 
 *23
 
 dire predictions, the plaintiff’s right eye, upon which no surgery was performed, showed a natural, marked improvement in visual acuity.
 

 The plaintiff thereupon brought this action against the several doctors and the hospital, basing her case of malpractice upon two theories: first, that the defendants Schachat and Kleinhandler had knowingly made misrepresentations as to the possible outcome of the operation which induced her to submit to the surgery to her injury and, second, that the defendants Phton, Doctor and Kleinhandler had recommended and performed the surgery when, in light of the condition of her left eye, such surgery was contraindicated by accepted medical practice.
 
 [1]
 
 The trial court dismissed the complaint against all the defendants at the conclusion of the plaintiff’s case. On appeal, the Appellate Division affirmed that dismissal as to two doctors, Dr. Schachat and Dr. Doctor, and modified as to the other two, Drs. Patón and Kleinhandler, as well as the defendant hospital which employed Kleinhandler as a resident doctor, by providing that the dismissal as to them should be “ without prejudice ” (16 A D 2d 374, 380).
 
 [2]
 

 As to the first of the plaintiff’s two theories, we agree with the Appellate Division’s conclusion and content ourselves with its statement that “ on this record it appears the plaintiff did not rely ” on the alleged misrepresentations of Dr. Schachat or Dr. Kleinhandler in deciding to undergo the corneal transplant (16 A D 2d, at pp. 376-377). Accordingly, we here limit our
 
 *24
 
 attention to the plaintiff’s action against Dr. Patón, Dr. Klein-handler and the hospital, based on her second theory of malpractice.
 
 [3]
 

 It is not Miss McDermott’s plaint that the operations were in any respect negligently performed but, rather, that the two-step surgical procedure — the scraping and the actual transplant— should never have been recommended or undertaken. It is her theory that standard medical practice establishes that a corneal transplant is never indicated where, as the defendants knew to be the case here, the disease of Puch’s dystrophy extends to the periphery of the cornea and the patient’s uncorrected eyesight is less than 20/200. In such a case, the plaintiff asserts, the disease in the corneal periphery will invade the graft and “ doom ” the operation to failure.
 

 Since the issue whether the defendants Paton and Klein-handler properly recommended and undertook to perform a corneal transplant is, quite obviously, not one within the realm of competence of a lay jury, it was incumbent upon the plaintiff to come forward with expert medical testimony to support her allegations of malpractice. (See, e.g.,
 
 Meiselman
 
 v.
 
 Crown Hgts. Hosp.,
 
 285 N. Y. 389, 396;
 
 Benson
 
 v.
 
 Dean,
 
 232 N. Y. 52, 56;
 
 Robbins
 
 v.
 
 Nathan,
 
 189 App. Div. 827, 830; see, also, 7 Wigmore, Evidence [3d ed.], § 2090; Ann. 81 ALR 2d 597.) At the trial, the plaintiff testified on her own behalf and called but two other witnesses, the defendants Dr. Patón and Dr. Klein-handler. She did not call an expert witness of her own nor did she introduce any other medical proof to establish her claim of malpractice. Instead, the plaintiff, after eliciting responses from Dr. Patón as to his examination, diagnosis and treatment in her case and after establishing that he had written a book on the subject of corneal transplants (“ Keratoplasty ”), sought to further question him — and, later, Dr. Kleinhandler—as to (1) the general background and risks of such operations; (2) the favorable conditions which, typically, must be present in a patient’s diseased eyes before transplanting is deemed suitable;
 
 *25
 
 and (3) the usual significance of a diagnosis of Fuch’s dystrophy extending to the periphery of the cornea and uncorrected vision of less than 20/200 on a patient’s chances for a successful transplant. In short, the plaintiff attempted to prove her malpractice ease by questioning the defendants, Patón and Kleinhandler, as to the established medical practice in the field of keratoplasty and their knowledge of it.
 

 The trial court, by sustaining objections to all such questions and, later, rejecting her offer of proof, prevented the plaintiff from eliciting such expert opinion evidence from the two defendants.
 
 [4]
 
 As a result, the plaintiff’s case was barren of expert testimony tending to establish a deviation by the defendants from proper and approved medical practice and the trial court had no choice, at that point, but to dismiss her complaint. The Appellate Division agreed that the plaintiff had placed “ mistaken reliance upon the expertise ” of the defendants and, as previously noted, modified the judgment of the trial court solely in light of
 
 “
 
 the possibility that the plaintiff may be able to supply the necessary expert medical evidence ” in a new action (16 A D 2d, at pp. 379-380).
 

 
 *26
 
 The only question of substance upon this appeal, then, is whether the plaintiff should have been given the opportunity of establishing her claim of malpractice by showing, through the testimony of the defendant doctors, that proper medical practice contraindicated the performance of a corneal transplant on a patient such as the plaintiff.
 

 It has long been recognized in this State that a party in a civil suit may be called as a witness by his adversary and, as a general proposition, questioned as to matters relevant to the issues in dispute. (CPLR 4501, 4512; see, also, 8 Wigmore, Evidence [McNaughton’s rev., 1961], § 2218; Richardson, Evidence [9th ed.], § 523.) Statutes in virtually every other jurisdiction reflect such a rule insofar as they provide, for example, that a party may call his adversary for interrogation “as if under cross-examination” (e.g., Cal. Code Civ. Pro., § 2055; Ill. Rev. Stat., ch. 110, § 60; Md. Ann. Code, art. 35, § 9; Fed. Rules Civ. Pro., rule 43, subd. [b]) or that such adverse party may be compelled to testify ‘ ‘ in the same manner and subject to the same rules as other witnesses ” (e.g., Kan. Gen. Stat., 1949, 60-2803; N. J. Rev. Stat., § 2:97-12). Modern rules of evidence have thus removed the common-law disability of parties to testify as witnesses (see 8 Wigmore, Evidence [McNaughton’s rev., 1961], § 2218, p. 170) on the ground, no doubt, that “‘plain sense and reason * * * obviously suggest that any living witness who could throw light upon a fact in issue should be heard to state what he knows, subject always to such observations as may arise as to his means of knowledge or his disposition to the truth. ’ ” (Morgan, McGuire and Weinstein, Evidence [4th ed.], p. 174.)
 

 While recognizing the right of a plaintiff in a malpractice action to call as a witness the defendant doctor, the courts of several States have sought to limit the type of questions which the plaintiff may put to him. Specifically, it has been held that a defendant physician may be required to testify to “facts within his knowledge ”—that is, “ what [he] actually saw and did”—but not as to whether his actions deviated from the accepted standard of medical practice in the community, a matter deemed to call for “ expert opinion ”.
 
 (Hull
 
 v.
 
 Plume,
 
 131 N. J. L. 511, 516-517; see, also,
 
 Osborn
 
 v.
 
 Carey,
 
 24 Idaho 158, 168;
 
 Hunder
 
 v.
 
 Rindlaub,
 
 61 N. D. 389, 406-410;
 
 Forthofer
 
 
 *27
 
 v.
 
 Arnold,
 
 60 Ohio App. 436, 441-442; cf.
 
 Ericksen
 
 v.
 
 Wilson,
 
 266 Minn. 401.) Other courts, however, permit the plaintiff to examine his doctor-opponent as freely and fully as he could any other qualified witness. (See
 
 Lawless
 
 v.
 
 Calaway,
 
 24 Cal. 2d 81, 90-91;
 
 State, Use of Miles
 
 v.
 
 Brainin,
 
 224 Md. 156; cf.
 
 Snyder
 
 v.
 
 Pantaleo,
 
 143 Conn. 290.)
 

 The latter decisions strike us as the more enlightened. That the defendant is an “ expert ” and that the particular questions asked of him are those which only an expert can answer, seem beside the point. It is at least arguable that the doctor’s knowledge of the proper medical practice and his possible awareness of his deviation from that standard in the particular case are, in a real sense, as much matters of “ fact ” as are the diagnosis and examination he made or the treatment upon which he settled. More importantly, however, by allowing the plaintiff to examine the defendant doctor with regard to the standard of skill and care ordinarily exercised by physicians in the community under like circumstances and with regard to whether his conduct conformed thereto, even though such questions call for the expression of an expert opinion, the courts do no more than conform to the obvious purpose underlying the adverse-party-witness rule. That purpose, of course, “is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action ’ ’.
 
 (State, Use of Miles
 
 v.
 
 Brainin,
 
 224 Md. 156, 161,
 
 supra;
 
 see, also,
 
 Lawless
 
 v.
 
 Calaway,
 
 24 Cal. 2d 81, 90,
 
 supra.)
 
 The issue whether the defendant doctor deviated from the proper and approved practice customarily adopted by physicians practicing in the community is assuredly “ pertinent and relevant ” to a malpractice action. Indeed, absent such proof, the plaintiff’s case would have to be dismissed. Moreover, evidence on this issue is, in most instances, “ available ” from the defendant doctor.
 

 The importance of enabling the plaintiff to take the testimony of the defendant doctor as to both “ fact ” and “ opinion” is accentuated by recognition of the difficulty inherent in securing “independent” expert witnesses. It is not always a simple matter to have one expert, a doctor in this case, condemn in open court the practice of another, particularly if the latter is a leader in his field. In consequence, the plaintiff’s only recourse
 
 *28
 
 in many cases may be to question the defendant doctor as an expert in the hope that he will thereby be able to establish his malpractice claim.
 

 There is nothing unfair about such a practice. Unlike his counterpart in a criminal prosecution, the defendant in a civil suit has no inherent right to remain silent or, once on the stand, to answer only those inquiries which will have no adverse effect on his case. Bather, he must, if called as a witness, respond to virtually all questions aimed at eliciting information he may possess relevant to the issues, even though his testimony on such matters might further the plaintiff’s case. We cannot agree with the suggestion that it is somehow neither sporting nor consistent with the adversary system to allow a party to prove his case through his opponent’s own testimony (see, e.g.,
 
 Osborn
 
 v.
 
 Carey,
 
 24 Idaho 158, 168,
 
 supra;
 
 see, also, Comment, 5 So. Cal. L. Rev. 448, 449-450) but, whatever the merits of this view, we prefer to believe that, in a situation such as the present,
 
 “
 
 [t]he ultimate requirement that judicial decisions be based on the * * * facts overcomes any detriment which might be suffered by the adversary system”. (Friedenthal, Discovery and Use of an Adverse Party’s Expert Information, 14 Stan. L. Rev. 455, 487; see, also, King, The Adverse Witness Statute and Expert Opinion, 4 Wayne L. Rev. 228, 229.)
 

 In this case, the plaintiff insists that she hoped to prove by the testimony of Dr. Patón himself that he was guilty of malpractice—by questioning him as to the propriety of a corneal transplant in view of the condition of her eyes and, then, if necessary, by attempting to induce him to give testimony favorable to her case by use of his authoritative text on the subject
 
 (supra,
 
 p. 25, n. 4). We perceive nothing wrong in such a technique or tactic, nor any reason for denying the plaintiff the opportunity so to proceed. Courts are intent upon arriving at just decisions and upon employing properly expedient means to attain such an end. If a defendant in a malpractice action may truthfully testify that his conduct conformed to the standard required, his case is, of course, substantially strengthened and, if he cannot so testify, the plaintiff’s chances of recovery are unquestionably increased. In either case, the objective of the court in doing justice is achieved.
 

 
 *29
 
 It is true that, in
 
 People ex rel. Kraushaar Bros. & Co.
 
 v.
 
 Thorpe
 
 (296 N. Y. 223), upon which the courts below and the defendants rely, this court explicitly held that a person may not be compelled to testify and give his opinion as an expert against his will. Our holding in
 
 Kraushaar,
 
 however, is not dispositive of the issue now before us. In that case, the witness (a real estate appraiser) called to testify as an expert was not a party to the action. Such an independent, disinterested witness, we held, could not be required to testify as an expert. That our decision in
 
 Kraushaar
 
 was not concerned with the situation where the expert and the defendant are one and the same person is implicit from the very tone of the opinion itself and, more importantly, from the reasoning underlying the decision. That reasoning, although not expressly articulated in the opinion, was relied upon in
 
 Buchman
 
 v.
 
 State
 
 (59 Ind. 1), a case cited with approval in
 
 Kraushaar
 
 (296 N. Y., at p. 225). As the Indiana court noted (59 Ind. 1, 6), “ ‘ to compel a person to attend [a trial] merely because he is accomplished in a particular science, art, or profession, would subject the same individual to be called upon, in every cause in which any question in his department of knowledge is to be solved. Thus, the most eminent physician might be compelled * * * to attend from the remotest part of the district, and give his opinion in every trial in which a medical question should arise ’ ’
 
 ’.
 

 It is quite clear that no such burden or unfairness is occasioned by the practice of compelling a doctor, who is actually a defendant in the malpractice action, to testify as an expert. It is, therefore, not inconsistent to permit the plaintiff to question the defendant as an expert even though we would not accord him the same right with respect to an unwilling witness who is in no way connected with the action. The very inability of a plaintiff in a malpractice action to
 
 co'inpel
 
 the attendance and testimony of a “ disinterested ” medical witness underscores the need and importance of allowing such a plaintiff the opportunity of questioning his adversary as an expert.
 

 In short, then, a plaintiff in a malpractice action is entitled to call the defendant doctor to the stand and question him both as to Ms factual knowledge of the case (that is, as to Ms examination, diagnosis, treatment and the* like) and, if he be
 
 *30
 
 so qualified, as an expert for the purpose of establishing the generally accepted medical practice in the community.
 
 [5]
 
 **8 While it may be the height of optimism to expect that such a plaintiff will gain anything by being able to call and question (as an expert) the very doctor he is suing, the decision whether or not to do so is one which rests with the plaintiff alone.
 

 One other point deserves mention. Upon the trial herein, the plaintiff sought, without success, to call as a witness one Dr. Lissman, an independent ophthalmologist who had examined her, prior to trial, at the instance of a defendant. It was her intention, we are advised, to interrogate the doctor solely about the condition of her eyes and such other facts which he might have ascertained on his examination. Since the judge who will be presiding at the new trial we are directing will undoubtedly be confronted with the same problem, we do no more than note that the plaintiff is certainly privileged to question Dr. Lissman to the extent she has indicated.
 

 The judgment appealed from should be modified to the extent of granting a new trial as to defendants Patou, Kleinhandler and the hospital in accordance with the opinion herein and, as so modified, affirmed, with costs to plaintiff against such defendants.
 

 Chief Judge Desmond and Judges Dye, Van Voorhis, Burke, Scileppi and Bergan concur.
 

 Judgment accordingly,
 

 [1]
 

 . Another doctor, Michael Weidman, whose name appears in the caption, was never served as a defendant in this action.
 

 [2]
 

 . This is a true modification, justifying an appeal as of right (see Cohen and Karger, Powers of the New York Court of Appeals, p. 221, n. 53), and, contrary to the defendants’ contention, the judgment of the Appellate Division “finally determines the action” within the sense of CPLR 5601 (a). (See, e.g., Cohen and Karger, Powers of the New York Court of Appeals, p. 60, n. 69.) The type of case relied upon by the defendants — one in which the Appellate Division judgment dismisses the complaint with leave to the plaintiff to plead over (see
 
 Rattray
 
 v. Raynor, 10 N Y 2d 494, 499; see, also, Cohen and Karger, Powers of the New York Court of Appeals, p. 323) — differs materially from the present ease. In such a case, the amended complaint to be served is in the same action and there is, accordingly, no final determination of that action. Here, however, the Appellate Division judgment does determine, that is, put an end to, the action brought by the plaintiff and requires her to institute a “ new ” action.
 

 [3]
 

 . The Appellate Division, as indicated, affirmed, without modification, the dismissal of the action against Dr. Doctor since, as it noted, he
 
 “
 
 did not participate in the decision to undertake the operative procedures and there is no claim that he made any representation to plaintiff ” (16 A D 2d, at p. 377). On this appeal, the plaintiff has voluntarily discontinued the action against him.
 

 [4]
 

 . The plaintiff’s offer of proof, which pertained to the questioning of Dr. Patón, was as follows:
 

 “I offer to prove that * * * after the proper questions, Dr. Patón would have testified that Fuch’s endothelial dystrophy, .the diagnosis that the lady had in the case, posed a substantial danger * * * to the operation of keratoplasty for the reason that the dystrophy invaded the graft.
 

 “
 
 He would have further testified that such an operation of keratoplasty can be done in a patient with a condition of Fuch’s endothelial dystrophy only under specific conditions, which are (1) that the periphery of the cornea must be free of the disease * * *; (2) that the eyesight without glasses, of course, should be 20 over 200 or better; (3) that keratoplasty should not be performed on patients with Fuch’s endothelial dystrophy where the vision is between 20 over 1,000 and 20 over 200.
 

 “And I further offer to prove that he would have stated that this exact information is contained in his book, ‘ Keratoplasty,’ written by him in 1955.
 

 “I further offer to prove that in answer to my questions he would have testified that of the 13 operations of keratoplasty that he had performed with Fueh’s endothelial dystrophy, only four showed some measure of •success, and all the others were failures, each resulting in some variance [sic] degree of adverse effect upon the patient in further impairment of vision and other complications.”
 

 [5]
 

 . It is, of course, assumed that a plaintiff, in naming a doctor as a defendant, has done so in good faith, on the basis of his relationship with the case and not as a device or Subterfuge in order to afford the plaintiff an opportunity to call him as an expert witness.