**Vincent Andrew APICELLA and Josephine Apicella, Plaintiffs,**

**v.**

**McNEIL LABORATORIES, INC., Defendant.**

**No. 74 C 635.**

United States District Court, E. D. New York.

Feb. 24, 1975.

Finley, Kumble, Heine, Underberg & Grutman, New York City, for plaintiffs; by Norman Roy Grutman, George B. Yankwitt, New York City, of counsel.

Rogers & Wells, New York City, for defendant; by David Dobbins, New York City, of counsel.

Hahn, Hessen, Margolis & Ryan, New York City, for the Medical Letter; by Marshall C. Berger, New York City, of counsel.

## MEMORANDUM and ORDER

WEINSTEIN, District Judge.

The discovery issue now presented is another example of the tension between the needs of news reporters in protecting confidential sources and of the public in providing effective justice. For the reasons indicated below, under the special circumstances now presented, we find the cost of requiring disclosure overbalances the speculative losses to a just determination of the facts in this litigation.

## I. FACTS

Plaintiffs Vincent and Josephine Apicella are suing McNeil Laboratories, manufacturer of the drug Innovar. On August 2, 1972, Mr. Apicella was operated on. As part of the anesthesia procedure, Innovar was administered. The plaintiffs contend that severe and permanent disabilities were caused by the drug because McNeil failed adequately to investigate, test and provide a warning of hazards known to it.

Defendant McNeil seeks to depose the chief executive officer of The Medical Letter on Drugs and Therapeutics, a bi-monthly publication widely circulated among members of the medical profession. Published by a non-profit corporation, this newsletter reports on the properties, effectiveness, and adverse effects of various drugs. In its issue of May 10, 1974, The Medical Letter published an article entitled "Dangers of Innovar." After stating that one consultant had witnessed at least three deaths from cardiovascular collapse following use of this medication, the article concluded that the drug "should be withdrawn from the market." Dr. Mark Abramowicz, appearing for The Medical Letter at the deposition, refused to identify the physician who had prepared the preliminary draft of the article and the consultants who had responded to that draft, particularly the one who had provided the evidence relating to the deaths caused by Innovar.

Since the safety of Innovar will be at issue at trial, plaintiffs argue that specific knowledge of adverse reactions to the drug would support their claim. Defendant McNeil believes that unless it is able thoroughly to evaluate the material used in preparation of the article, it will be hampered in its defense.

Defendant moves for an order under Rule 37 of the Federal Rules of Civil Procedure to compel The Medical Letter to disclose the name of the person who wrote the preliminary draft, and the names of the consultants to whom the draft was sent, and to produce related correspondence and documents. Plaintiffs have joined in this motion.

It is not clear that sources of information, other than The Medical Letter, about death and disability associated with use of the drug will be unavailable to the parties. Hearings on Innovar held before a subcommittee of the Committee on Government Operations of the House of Representatives in August 1973 and March 1974 suggest that McNeil Laboratories and the Food and Drug Administration (FDA) were aware of the potential dangers of Innovar and of

a number of adverse reactions, including death, following administration of the drug. *See* Hearings on the Safety of a New Combination Drug, Innovar, Before a Subcommittee of The House Comm. on Gov't Operations, 93d Cong., 1st & 2d Sess. at 1, 5, 11 (1973–74).

According to the testimony at the hearing, a representative of McNeil had told a public advisory committee at FDA that 218 individuals had died after receiving Innovar. *Id.* at 11. A written report concerning a FDA investigation in St. Louis stated that during the pre-marketing stage and the five years since FDA approval of Innovar for marketing, 65 reports of adverse reactions considered either serious or unusual had been received. Dr. John Adriani, Professor of Surgery at Tulane University School of Medicine and Director of the Department of Anesthesiology at Charity Hospital in New Orleans, Louisiana, reported that the American Medical Association's (AMA) 1971 edition of *Drug Evaluations,* prepared by the AMA's Council on Drugs, of which he was chairman, found that the fixed ratio combination drug was "irrational" and "not recommended." *Id.* at 19.

News clippings reprinted in the Hearing Report indicate that there are at least ten other lawsuits involving alleged adverse reactions to Innovar. *Id.* at 2–3. In response to these reports, Dr. J. Richard Crout, Director of the FDA's Bureau of Drugs, stated that his office had been able to match eight cases submitted by McNeil with descriptions from the St. Louis, Missouri, news article.

Pertinent records of the FDA may be subject to the provisions of the Freedom of Information Act, 5 U.S.C. § 552, and to the regulations pertaining to official records and information of the Department of Health, Education and Welfare and the FDA. 45 CFR § 5 and 21 CFR § 4.1. *See also* Pub.L. 93–502, 88 Stat. 1561, amending 5 U.S.C. § 552 (1974). The court has communicated with the FDA and has received some information, now part of the public court file, which may be helpful to the parties. Thus far the court has been denied access to other information which the FDA considers exempt from disclosure pursuant to 18 U.S.C. § 1905, 21 U.S.C. § 331(j) and 5 U.S.C. § 552(b) (4) covering "trade secrets and commercial or financial information obtained from a person and privileged or confidential." If the parties' request for the information is also denied, they may file a complaint in the appropriate district court to review the agency's refusal to produce the records. 5 U.S.C. § 552(a) (3) and (4).

Defendant may already have in its files much, or all, of the information it seeks in this discovery motion. Plaintiffs could obtain it for their use by unobjectional discovery devices.

## II.  BALANCING APPROACH IN DISCOVERY

The Apicellas and McNeil Laboratories maintain that Garland v. Torre, 259 F.2d 545 (2d Cir.), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), requires denial of The Medical Letter's motion for a protective order. That case involved a libel action by actress Judy Garland against Marie Torre, a columnist who had allegedly written defamatory statements about Miss Garland which Miss Torre attributed to a CBS executive. The court compelled disclosure of the name of the executive because the identity of the newswoman's source was essential to the libel action —it "went to the heart of the plaintiff's claim." 259 F.2d at 550. In a libel case, unlike other civil actions, the reporter or publication is a party to the suit. Moreover, the identity of the source may be crucial to the claim or defense. *See also* Carey v. Hume, 160 U.S.App.D.C. 365, 492 F.2d 631, cert. pet. dismissed, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); Adams v. Assoc. Press, 46 F.R.D. 439 (S.D.Tex. 1969).

■ Unlike *Garland,* the information sought here is relevant, but not essential to the resolution of the judicial controversy. Baker v. F. & F. Investment, 470 F.2d 778, 784, (2d Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973). Thus, in this context, we cannot apply a *per se* rule; instead we must balance the competing interests. Cf. Henkin, Privacy and Autonomy, 74 Colum.L.Rev. 1410 (1974) ("often the public good is an accommodation or choice between private rights").

A. *Relevancy*

■ District Courts are granted broad discretion in supervising the extent of discovery before trial. Fed. R.Civ.P., Rules 26 and 37; Baker v. F. & F. Investment, 470 F.2d 778, 781 (2d Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973). In exercising this authority, the court must consider the possible necessity for the information and the costs of providing it.

■ Were it not for the journalist's claim, under standard practice in this court there is no doubt that discovery would be granted since the information sought "is relevant to the subject matter involved in the pending action" or "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P., Rule 26(b)(1). The fact that other persons suffered harm from the drug is relevant since it has a "tendency to make the existence of . . . [a fact that is] of consequence to the determination of the action more probable . . . than it would be without the evidence." Fed.R.Ev., Rule 401.

The right of litigants to discover and present relevant evidence in civil litigations is given great weight in federal courts.

"Underlying that right is the basic proposition that the public 'has a right to every man's evidence' and that, in examining any claim of exemption from the correlative duty to testify, there is the 'primary assumption that there is a general duty to give what testimony one is capable of giving and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.' " Democratic National Comm. v. McCord, 356 F.Supp. 1394, 1396–97 (D.D.C.1973).

This attitude is reflected in liberal discovery provisions in the federal courts and in the trend toward admitting as much evidence as possible so that the facts may be more accurately determined. *See, e. g.,* Fed.R.Civ.P., Rule 26; Fed. R.Ev., Rule 102.

Moreover, there are more than private issues at stake in this litigation. When a case involves a potentially dangerous drug, the public interest may well be served by the revelation of all pertinent information to the triers. In important areas about which many citizens are concerned, such as the one involved here, parties, often dubbed "private attorney generals," are indirectly litigating in the public interest. It may be particularly important to admit relevant evidence in an effort not only to compensate for past injury or death but to prevent future personal tragedies.

We note, too, plaintiffs' contention that it is virtually impossible to get expert medical testimony, particularly the kind of first hand evidence that could be obtained by requiring The Medical Letter to disclose the sources of information contained in the article on Innovar. The New York courts, for example, partly in recognition of this problem, have shown a tendency to interpret rules on admissibility and sufficiency of evidence in favor of plaintiffs in malpractice cases. *See, e. g.,* McDermott v. Manhattan Eye Hosp., 15 N.Y.2d 20, 255 N.Y.S.2d 65, 203 N.E.2d 469 (1964) (plaintiff may call defendant-doctor as an expert witness to help in establishing claim of malpractice); *cf.,* Toth v. Community Hosp. at Glen Cove, 22 N.Y.2d 255, 292 N.Y.S.

2d 440, 239 N.E.2d 368 (1968); Waltuck v. Poushter, 42 A.D.2d 673, 344 N.Y.S. 2d 369 (1973).

### B. *Policy Equivalent to Privilege Protecting News Sources*

■ No absolute rule of privilege protects newsmen. Nevertheless, the policy protecting news reporters' sources is sufficiently close to a privilege to warrant exclusion from discovery in some instances. *Cf.* Fed.R.Civ.P. 26(b)(1); Baker v. F. & F. Investment, 470 F.2d 778 (2d Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973).

### 1. *Constitutional Basis for Policy Protecting News Sources*

In Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court held that reporters could be required to disclose confidential sources to a grand jury conducting a criminal investigation. But the language of the opinion reflects a concern for unfettered newsgathering as a function of the First Amendment, 408 U.S. at 681, 92 S.Ct. at 2656. Justice Powell, concurring, found that in some situations a privilege-like protection for news sources might be appropriate:

> "The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." *Id.*, 408 U.S. at 710, 92 S.Ct. at 2671.

In a civil proceeding this approach is even more appropriate than in a criminal action. As the Second Circuit noted in Baker v. F. & F. Investment,

> "If[,] as Mr. Justice Powell noted in [Branzburg], instances will arise in which First Amendment values out-weigh the duty of a journalist to testify even in the context of a criminal investigation, surely in civil cases, courts must recognize that the public interest in non-disclosure of journalists' confidential news sources will often be weightier than the private interest in compelled disclosure." 470 F.2d at 785.

*See also* Carey v. Hume, 160 U.S.App. D.C. 365, 492 F.2d 631, 636, cert. pet. dismissed, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); Democratic National Committee v. McCord, 356 F.Supp. 1394 (D.D.C.1973); United States v. Liddy, 354 F.Supp. 208, 213 n. 14 (D.D. C.1972); State of Vermont v. St. Peter, 315 A.2d 254 (Vt.1974); J. M. Gora, The Rights of Reporters, 37–41; 197 (1974); Note, Reporters & Their Sources: The Constitutional Right to a Confidential Relationship, 80 Yale L.J. 317, 358–59 (1970); Note, The Right of the Press to Gather Information, 71 Colum. L.Rev. 838, 863 (1971); *cf.* Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); Comm. on Fed. Leg., Assoc. of the Bar, City of N. Y., Report on Journalists' Privilege Legislation, 17 (1973).

### 2. *New York Policy Protecting News Sources*

New York has enacted a statute designed to give some protection to journalists seeking to protect confidential sources. It reflects a policy similar to that developed by federal courts.

■ This legislation, while it does not create a privilege, forbids use of the contempt power against individual journalists who refuse to divulge. It provides in pertinent part:

> "Notwithstanding the provisions of any general or specific law to the contrary, no professional journalist or newscaster . . . shall be adjudged in contempt by any court, the legislature or other body having contempt powers for refusing or failing to disclose any news or the source of any

news . . ." N.Y.Civil Rights Law § 79–h (McKinney's Consol.Laws, c. 6, Supp. 1974–75).

Since no state privilege is created, the state rule has only a limited effect either under Erie-Tompkins rationale, *see, e. g.,* Republic Gear Co. v. Borg-Warner Corp., 381 F.2d 551, 555 n. 2 (2d Cir. 1967); Mass. Mutual Life Ins. Co. v. Brei, 311 F.2d 463 (2d Cir. 1962), or under Rule 501 of the Federal Rules of Evidence, which provides that state rules of "privilege" must be applied in proving or disproving "an element of a claim or defense as to which the State law applies the rule of decision." We need not address ourselves to the issue of possible conflict between the privilege policies of the state of the consultant, the place of communication, The Medical Letter, the forum and the one whose substantive law governs the merits. Because The Medical Letter is edited and published in New York—the forum and state whose substantive law applies— and, so far as we know, the communications to it were made in New York, any test would point to New York's privilege law. *See, e. g.,* Kaminsky, State Evidentiary Privileges in Federal Civil Litigation, 43 Ford.L.Rev., text at nn. 9–11, 39–56 (1975) (suggesting "center of gravity" approach).

The State statute does

"reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment . . .." Baker v. F. & F. Investment, 470 F.2d 778, 782 (2d Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973).

Insofar as reasonably possible, this state substantive policy should be followed. *Cf.* Fed.R.Ev., Rules 302, 501 and 601.

3. *Policy Applicable to Technical Publications*

■ Protection for technical publications such as The Medical Letter is included within the general federal policy. The Supreme Court, in Lovell v. City of Griffin, stated:

"The liberty of the press is not confined to newspapers and periodicals . . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1935).

In Branzburg v. Hayes, 408 U.S. 665, 705, 92 S.Ct. 2646, 2668, 33 L.Ed.2d 626 (1972), the court reiterated that the traditional doctrine of freedom of the press is the right of all types of reporters:

"The informative function asserted by representatives of the organized press in the present cases is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists." *Id.* at 704, 92 S.Ct. at 2668.

It includes,

"the lonely pamphleteer who uses carbon paper or a mimeograph just as much as . . . the large metropolitan publisher who utilizes the latest photocomposition methods." *Ibid.*

*See also* Mills v. Alabama, 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966).

The protection of the identity of sources is often essential to the willingness of these sources to give information to the press, and thus contribute to the "marketplace of ideas," a concept fundamental to our political system. *See, e. g.,* Garrison v. Louisiana, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964); New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964); Stromberg v. California, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931).

The Medical Letter, with a circulation of 70,000, performs a public and professional service by providing information on various drugs. Free communication in the vital area of health, just as in politics, should be encouraged. There is substance to The Medical Letter's contention that if its consultants were forced to participate in searching cross-examinations, often resulting in embarrassment and inconvenience, they would ·hesitate to act as sources in the future, to the detriment of the medical community and the public.

### III. STRIKING THE BALANCE

#### A. *Discovery Motion Must be Denied*

Although there is no unqualified "newsman's privilege," the possible adverse effect on First Amendment rights is a paramount consideration. Disclosure would probably unfavorably affect the ability of The Medical Letter to obtain the services of consulting physicians in the future. In addition to the time-consuming problems of depositions and trial appearances, doctors whose names were revealed and linked to situations in which patients had died, or were seriously injured, would themselves be likely targets for malpractice suits. Their reticence to supply information to The Medical Letter might reduce the quantity and quality of medical evaluations of potentially dangerous drugs.

█ The parties requesting disclosure, in addition to demonstrating need, should be able to show that they are unable to obtain the information from a source other than The Medical Letter. They have not done so. Moreover, plaintiffs' concern over the lack of medical experts willing to speak·out on Innovar may be unfounded. As Judge Bonsal noted when he denied discovery of a reporter's sources, "there were other available sources of information . . . which appellants had not exhausted." Baker v. F. & F. Investment, 470 F.2d 778, 783 (2d Cir. 1972), cert. denied, 411

U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973).

The Medical Letter should not at this time be forced to reveal the author of the preliminary draft on Innovar, the names of the consultant doctors, or to produce correspondence relating to the article which undoubtedly would contain the sought-after names or information.

#### B. *Limitations on Use at Trial*

If the Medical Letter article is relied upon by an expert during direct examination or called to the attention of an expert during cross-examination, and established as a reliable authority, it may have great weight during the trial. *See* Fed.R.Ev., Rules 703, 803(18).

Rule 703 permits an expert to rely on facts or data not admissable in evidence. In this case the court would give great deference to a medical expert's judgment that the information in the article is "of a type reasonably relied upon by experts in the particular field" (F.R.Ev., Rule 703) in allowing the expert to base his opinion on it. *See, e. g.,* Kibert v. Peyton, 383 F.2d 566, 570 (4th Cir. 1967); Birdsell v. United States, 346 F.2d 775 (5th Cir.), cert. denied, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965), rehearing denied, 383 U.S. 923, 86 S.Ct. 900, 15 L.Ed.2d 680, 384 U.S. 914, 86 S.Ct. 1347, 16 L.Ed.2d 368 (1966); Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637, 641 (1962) (en banc). *Cf.* United States v. Bohle, 475 F.2d 872 (2d Cir. 1973).

█ Rule 803(18) of the Federal Rules of Evidence would permit the article to be used as evidence-in-chief. To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published periodicals on a subject of medicine, "established as a reliable authority by the testimony or admission" of an expert, are not excluded by the hearsay rule. *See also* Western Assurance Co. v. J. H. Mohlman Co., 83 F. 811, 820–21 (2d

Cir.), cert. denied, 168 U.S. 710, 18 S.Ct. 949, 42 L.Ed. 1213 (1897); Bair v. American Motors Corp., 473 F.2d 740, 743–744 (3d Cir. 1973).

Were the court to allow plaintiffs to make use—whether through Rule 703 or through Rule 803(18)—of the admittedly damaging information about Innovar contained in the article, the defendant McNeil would be severely prejudiced. Having been denied discovery, it might be unable to counter the anonymous reports of deaths following induction of Innovar, or to attack the basis for the conclusion that the drug should be withdrawn from the market.

Courts faced with this kind of problem have adopted special procedures in dealing with privileged or secret information so that the interests of all parties could be accommodated. For example, in the trade secrets area, the court in A. H. Robins Co. v. Fadely, 299 F.2d 557 (5th Cir. 1962), upheld the lower court's ruling permitting the plaintiff to refuse to disclose the name of its chemical "tracer", subject to the penalty that no proof by him concerning the trade secret would be permitted at trial since the defendant would be unable to properly prepare itself on that issue. Cf. Stamicarbon v. American Cyanamid Co., 506 F.2d 532, 540–542 (2d Cir. 1974).

In United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), the Supreme Court, in exercising "judicial control over the evidence in a case", applied a "formula of compromise" in ruling on a claim of privilege by the Secretary of the Air Force. 345 U.S. at 9, 73 S.Ct. at 533. As in the situation presented in this case, the necessity for the information was minimized by an available alternative route to the essential facts. Thus any disclosure of the disputed report was prohibited.

Since defendant McNeil may be unable to ascertain the basis for the information in the article on Innovar, it will be severely disadvantaged in attempting to refute it. As in Reynolds, the plaintiffs

have not demonstrated that they will be similarly disadvantaged if they are forced to look beyond the Medical Letter to discover data on Innovar.

Finally, the court must consider its responsibilities under Rule 403 of the Federal Rules of Evidence. Relevant evidence may be excluded in the court's discretion, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay . . . ." See, e. g., Smith v. Spina, 477 F.2d 1140, 1146 (3d Cir. 1973); United States v. Ravich, 421 F.2d 1196, 1204–05 (2d Cir.), cert. denied, 400 U.S. 834, 91 S.Ct. 69, 27 L. Ed.2d 66 (1970).

In evaluating these dangers we must bear in mind that the article, unlike a treatise, deals not with general background information, but with precisely the question which will be before the jury, the dangerous nature of this particular drug when used as directed by the manufacturer. Yet it does so in a somewhat misleading way, for the issue is not the negligence of the manufacturer or its failure to be aware of dangers in 1974 when The Medical Letter was published, but the failures, if any, two years earlier, in 1972. Publication after the suit was commenced could have no bearing at all on the issue of notice.

There is a danger that the jury might focus on the accuracy of the 1974 article rather than on liability in 1972, when knowledge of the art may have been quite different. To the element of unfair prejudice in being unable to cross-examine experts who relied upon the article in arriving at an opinion, there is thus added the hazard of confusion and misleading of the jury. The trial will, moreover, be considerably extended if the validity of the 1974 charges in The Letter need to be tried.

▮ Under the circumstances thus far made known to the court, use of The Medical Letter of May 10, 1974 at trial

is not permissible. Neither party may use it during the direct or cross-examination of an expert medical witness, or in any other manner. Experts are to be directed to reach an opinion without considering its contents.

## CONCLUSION

The motion to compel discovery from The Medical Letter is denied. The parties may renew their motion if, after exhausting other sources of information, they can demonstrate a much more compelling need.

So ordered.