OPINION OF THE COURT
Patrick H. NeMoyer, J.
This action seeks recovery of damages for negligence/medical malpractice allegedly committed by defendants in the course of their care and treatment of Raymond Buhar (plaintiff). The named defendants include Dr. Brodman, a heart surgeon who performed a triple coronary artery bypass and aortic valve replacement procedure upon plaintiff on October 1, 2003. The complaint and bill of particulars focus on the surgery and its aftermath. After Dr. Brodman initially closed up plaintiff following the bypass and valve replacement, plaintiff experienced significant bleeding that required him to be transfused and surgically reopened in order to stem the source of the bleeding. However, those complications are not set forth in Dr. Brodman’s operative report, which was dictated before the complications arose and was never supplemented. Plaintiff suffered additional complications following his discharge from the hospital three days after the operation, losing 20 pounds and experiencing repeated spikes in his body temperature over the ensuing weeks. During that time, plaintiff treated and otherwise consulted with, among other defendants in the case, his longtime cardiologist, Dr. Boersma, who was privy to Dr. Brodman’s operative report but not to other hospital records disclosing the intraoperative bleeding and the reopening of plaintiffs chest. Ultimately, on November 9, 2003, plaintiff presented at the hospital emergency room with an elevated temperature of 102.9 degrees and symptoms of having suffered a stroke. Plaintiffs theory of the case seems to be that, postoperatively, he developed sepsis that caused an embolism, in turn resulting in the stroke, outcomes that would have been avoided had his condition been properly assessed and recorded.
Thus, as against Dr. Brodman, the bill of particulars alleges, among other specifications of negligence, that Dr. Brodman *326 failed to mention in his operative report that extraordinary blood loss had occurred during surgery (a complication that allegedly increased the risk of postoperative infection), thereby failing to communicate adequately with, and indeed affirmatively misleading, plaintiffs other health care providers, including Dr. Boersma, the regular cardiologist, defendant Urschel, plaintiffs cardiothoracic nurse practitioner, and defendant Cellino, plaintiffs general practitioner. (It is similarly alleged that Urschel failed to apprehend and adequately communicate plaintiffs postoperative condition, and that Dr. Boersma failed to apprehend and/or inquire into it; the court is not privy to the allegations against Dr. Cellino.)
Now before the court is a motion by plaintiff to compel Dr. Boersma to submit to a further examination before trial (EBT) at which he should be made to answer a line of questions that he was instructed by his counsel not to answer at a prior EBT. That motion is opposed by all defendants in the case. The court understands that the disposition of the instant motion concerning Dr. Boersma’s EBT has implications for what might transpire at the prospective EBTs of Urschel and perhaps other defendants.
At the abortive EBT, it was established that Dr. Boersma received the operative report of Dr. Brodman; that it was important to Dr. Boersma that the operative report accurately describe what had transpired during surgery; and that, after reviewing the report (and despite a certain telephone conversation), Dr. Boersma had no awareness of the complications that had been encountered during the October 1, 2003 surgery, more particularly, of the fact that the patient “had to be re-opened during the procedure to control bleeding.” Nevertheless, the defendant witness was directed by his counsel not to answer the following questions:
(1) “Would knowledge of that [i.e., that the patient ‘had to be re-opened during the procedure to control bleeding’] have been important to you in your postoperative management of the patient, had you — had you known of that, sir?”;
(2) “[W]hat, if any, effect would [that knowledge] have had on your management of the patient postoperatively?”; and
(3) “Is bleeding and a need to reopen a patient because of bleeding a complication of which you would want to know?”
The defendant witness was instructed in each instance not to answer on the ground that opposing counsel was posing a “hypothetical question.”
*327 Upon reading the exchange among counsel and the witness, and upon its consideration of the law governing the conduct of depositions — particularly those of physician defendants in medical malpractice cases — the court concludes that Dr. Boersma’s EBT was impermissibly curtailed by his counsel, and that the defendant witness shall be redeposed and shall answer the line of questioning propounded by plaintiffs counsel (see Orner v Mount Sinai Hosp., 305 AD2d 307, 309 [1st Dept 2003]; Forgays v Merola, 222 AD2d 1088 [4th Dept 1995]).
Effective October 1, 2006, part 221 of 22 NYCRR, entitled “Uniform Rules for the Conduct of Depositions,” generally mandates that, upon the making and recording of an objection to a question at an EBT, the answer nonetheless “shall be given and the deposition shall proceed subject to the objections and to the right of a person to apply for appropriate relief pursuant to article 31 of the CPLR” (22 NYCRR 221.1 [a]; see generally CPLR 3115 [a], [d], [e]). 22 NYCRR 221.2 limits the right of the witness to refuse to answer on the advice of counsel. It states that a
“deponent shall answer all questions at a deposition, except:
“(a) to preserve a privilege or right of confidentiality;
“(b) to enforce a limitation set forth in an order of a court; or
“(c) when the question is plainly improper and would, if answered, cause significant prejudice to any person” (22 NYCRR 221.2).
CPLR 3115, and indeed the whole of CPLR article 31, makes clear that the discoverability of information before trial is not tantamount to the admissibility of such information at trial (see generally Suk Ching Chan v Otis El. Co., 147 AD2d 395 [1st Dept 1989]).
In McDermott v Manhattan Eye, Ear & Throat Hosp. (15 NY2d 20 [1964]), the Court of Appeals unequivocally held that
“a plaintiff in a malpractice action is entitled to call the defendant doctor to the stand [i.e., at trial] and question him both as to his factual knowledge of the case (that is, as to his examination, diagnosis, treatment and the like) and, if he be so qualified, as an expert for the purpose of establishing the generally accepted medical practice in the community” (id. at 29-30; see Gilly v City of New York, 69 NY2d 509, *328 511 [1987] [reading McDermott as holding that plaintiff could “examine his doctor-opponent as fully and freely as other qualified witnesses, and that such testimony could include expert opinion”]).
In Johnson v New York City Health & Hosps. Corp. (49 AD2d 234 [2d Dept 1975]), the Second Department addressed whether the McDermott holding “should be extended to examinations before trial,” holding that it should, for the commonsense reason that “the scope of the pretrial examination is even broader than that at the trial” (id. at 236-237).
In its subsequent decision in Carvalho v New Rochelle Hosp. (53 AD2d 635 [2d Dept 1976]), however, the Second Department set forth the following rules governing this situation:
“In an action for malpractice brought against more than one physician, one defendant physician may not be examined before trial about the professional quality of the services rendered by a codefendant physician if the questions bear solely on the alleged negligence of the codefendant and not on the practice of the witness .... Where, however, the opinion sought refers to the treatment rendered by the witness, the fact that it may also refer to the services of a codefendant does not excuse the defendant witness from [being deposed] as an expert” (id. at 635).
Applying those rules, the Carvalho court held it proper for plaintiffs counsel to ask the first, but proper for the defendant witness’s counsel to advise the witness not to answer the second, of the following two questions:
“(1) . . . ‘[I]s the presence of a fecalith in any way significant to the possibility of the development of an intra-abdominal abscess postoperatively?’ [; and] (2) ‘Would it have been good medical practice for a doctor having removed an appendix and receiving this pathology report subsequent to the removal of the appendix to have requested a culture and sensitivity on the purulent exudate material described in the pathology report?’ ” (Id.)
In arriving at that conclusion, the Second Department reasoned that it could not “be said as a matter of law that the first question does not refer to the services performed by [the defendant witness]” (id. at 635-636).
This court has serious doubts that the decision in Carvalho would be rendered today, in the era of 22 NYCRR part 221 (there *329 are no appellate citations to Carvalho since October 2006). Beyond that, this court has serious misgivings about the provenance (let alone the sense) of the rule set out in Carvalho, i.e., that the defendant witness may not be examined before trial about the professional quality of the services rendered by a co-defendant physician if the questions bear solely on the alleged negligence of the codefendant and not on the practice of the witness.[1]
*330 Moreover, even applying the Carvalho decision according to its tenor, this court cannot conclude that the EBT questions posed by plaintiffs counsel ran afoul of the specified limitations on questioning of physician defendants. In no instance did plaintiffs counsel ask the defendant witness to opine explicitly on whether the codefendant physician met or deviated from the applicable standard of medical care. Each question focused, at least in part, on Dr. Boersma’s treatment of plaintiff and knowledge of his case, and not exclusively the treatment rendered by another medical provider, i.e., Dr. Brodman (see Carvalho, 53 AD2d at 635-636). The defendant witness may have lacked contemporaneous knowledge of the surgical complications, but he knew at relevant times that no such complications were disclosed in the operative report of Dr. Brodman. Moreover, it was and continues to be within the defendant witness’s personal knowledge whether his medical management of the patient postoperatively was affected by the lack of information (cf Giventer, 181 Misc 2d at 586-587; Cruz v City of New York, 135 Misc 2d 393, 395-396 [Sup Ct, NY County 1987]). Thus, the objected-to questions all referred at least in part to the services performed (or not performed) by Dr. Boersma himself (see Carvalho, 53 AD2d at 635-636; see also Bryant v Bui, 265 AD2d *331 848, 849 [4th Dept 1999]; Forgays, 222 AD2d at 1088; Glass v Rochester Gen. Hosp., 74 AD2d 732, 733 [4th Dept 1980]; Harley, 57 AD2d at 828; cf. Claudino v Mastellone, 286 AD2d 697, 697-698 [2d Dept 2001]; Dare v Byram, 284 AD2d 990, 991 [4th Dept 2001]).[2] If Dr. Boersma feels that he cannot say whether and how his management of the patient would or might have been altered by knowing specified additional facts about the patient, or whether bleeding and the need to reopen a patient to control bleeding was indeed an ‘ ‘important’ ’-to-know medical fact, then he need merely say so in response to plaintiff’s queries. In sum, the court cannot say that it was “plainly improper” and prejudicial (22 NYCRR 221.2 [c]) for plaintiffs counsel to inquire into such facts and opinions in the manner in which he did during the abortive EBT of Dr. Boersma.
Although none of the above-cited cases sets forth any prohibition on asking the defendant physician a hypothetical question, defendants herein nonetheless contend that hypothetical questions are categorically prohibited from use as part of plaintiffs effort to examine the defendant physician in advance of trial. In so contending, defendants cite this court to the unpublished decision and accompanying order of former Justice Mintz in Lawson v Michalakes (Sup Ct, Erie County, Dec. 20, 1995, index No. 94/1400, affd without op 236 AD2d 900 [4th Dept 1997]).[3] Although defendants treat the trial court’s and Fourth Department’s orders[4] in Lawson as definitive on the question at bar, this court notes that Lawson has never been cited in any of *332 ficially published court decision in this or any other jurisdiction. More important, this court has read the order and decision in Lawson and cannot conclude that their directives, or even the related “guidelines” set out by Justice Mintz’s law clerk, constitute blanket prohibitions on the use of hypothetical questions at depositions. Even if Lawson did constitute a blanket prohibition on the use of hypotheticals during EBTs, this court could not and would not follow that decision, because such a blanket prohibition would contravene the appellate guidance on the subject, beginning with the decision of the Court of Appeals in McDermott, which unequivocally holds that a plaintiff may question the defendant doctor as an expert for the purpose of establishing the general standard of medical care in the community. It is this court’s understanding that asking a hypothetical question is but one permissible means — although certainly not the only or even the preferred means (see CPLR 4515) — of eliciting qualified opinion from an expert witness. For that reason alone, a blanket ban on the use of hypothetical questions simply could not be reconciled with the liberal rule of evidence articulated by the Court of Appeals in McDermott and fully applied to EBTs by *333 such cases as Johnson (49 AD2d at 236-237) and Glass (74 AD2d at 733).
Moreover, even by its own terms, which are far narrower than portrayed by defendants, Justice Mintz’s decision in Lawson seems to permit hypotheticals and other kinds of questions at depositions where, as here, they are directed to eliciting opinions based upon facts of which the witness is aware. For that reason, Justice Mintz proscribed only “compound” or “complex” hypothetical questions, or, in his law clerk’s articulation of the ruling, the “kinds of hypothetical questions that are typically asked of [‘independent’] experts at trial.”[5] In other words, Justice Mintz seems to have condemned only those hypothetical questions that ask the witness to assume a “range of facts” not otherwise known to that witness at the time of his or her treatment of the plaintiff or decedent. On the other hand, Justice Mintz held that the plaintiff would not be precluded from “asking opinion questions based upon the facts elicited from the defendant as he or she testifies to at the deposition, or [facts that] are in his or her records available at the deposition.”
Thus, even accepting Justice Mintz’s evidentiary framework as set out in Lawson, this court could not conclude that the questions posed by plaintiff’s counsel to Dr. Boersma were impermissible. The court doubts that two of the three questions in dispute can even be classified as hypotheticals. The first question (recast to its essence) merely asked the defendant witness whether it would have been important for him to know whether (or that) the patient had suffered complications during his recent surgery. That question did not ask Dr. Boersma to assume any fact or state of affairs not known to him. The same is true with regard to the third question, which asked the defend *334 ant witness whether bleeding and a need to reopen the patient because of the bleeding was a complication that he would have wanted to know about. Those questions are not hypothetical and speculative but rather factually based. Further, they seek information that the witness is uniquely positioned to impart and that is logically related to the case, in particular, to the issues of whether the defendant witness exercised due care in treating the patient and whether the patient’s treatment at the hands of other medical providers might have been a proximate cause of his injuries (see Forgays, 222 AD2d at 1088).
The second question, which asks the witness if his awareness of the surgical complications would have had any effect — and, if so, what effect — on his management of the patient postoperatively, might properly be labeled as hypothetical inasmuch as it asks the witness to assume a certain state of affairs — i.e., a more perfect contemporaneous knowledge of the patient’s condition at the time of the treatment in question. Nonetheless, the question certainly cannot be characterized as the “compound” or “complex” hypothetical condemned by Justice Mintz. Asking the physician witness whether he would have done “x” if he had been aware of fact “y” is little if any different from asking whether his failure to do “x” (or his failure to see any reason to do “x”) was on account of his ignorance of “y,” a question that is not in the least hypothetical in nature. Again, the thrust of the second question is factual/historical insofar as it essentially asks the defendant physician, who again is uniquely in a position to answer the query, whether his care and treatment of the patient was adversely affected by what he (admittedly or assertedly) did not know about the patient. Again, the question is material to the case insofar as it relates to whether the defendant witness himself met or deviated from the standard of care and which among several defendants or agencies might have caused or contributed to the patient’s injuries (see Forgays, 222 AD2d at 1088; see also McGuire v Zarlengo, 250 AD2d 823, 824 [2d Dept 1998]).
Accordingly, the motion of plaintiff to compel defendant Boersma to submit to further examination before trial, and to answer those questions previously not answered, as well as related follow-up questions, is granted.

. That rule is not to be found in, and does not even seem to be suggested by, the decisions in McDermott and Johnson, the sole authorities cited by the Second Department in Carvalho. Again, McDermott unequivocally holds that “a plaintiff in a malpractice action is entitled to” question the defendant doctor “both as to his factual knowledge of the case (that is, as to his examination, diagnosis, treatment and the like) and, if he be so qualified, as an expert for the purpose of establishing the generally accepted medical practice in the community” (McDermott, 15 NY2d at 29-30), whereas Johnson merely holds that the McDermott rule applies fully to examinations before trial (Johnson, 49 AD2d at 236-237). Neither McDermott nor Johnson involved a defendant physician’s being asked to opine specifically on the conduct of a codefendant physician (or a hypothetical physician) in relation to the standard of care, and thus neither decision went so far as to say that such opinion would not be a proper area of inquiry of the defendant witness in a medical malpractice case. The “if he be so qualified” language of McDermott would seem to be directed by its terms to the practice of a codefendant physician (possibly including one practicing in a different community and area or specialty than the defendant witness) since a defendant witness would almost assuredly be qualified to opine as to the standard of care in his own community and area or specialty of practice.
Moreover, with regard to the internal logic of the Second Department’s holding in Carvalho, it is impossible for this court to discern why the second Carvalho question ran afoul of the Carvalho rule while the first question did not. Neither of the Carvalho questions called upon the defendant witness to inculpate or exonerate the codefendant physician specifically, and both questions arguably went to the witness’s knowledge of a particular medical standard within his expertise. With regard to the external logic of the Carvalho holding, both Carvalho questions fell well within the compass of the Mc-Dermott! Johnson rule permitting the defendant witness to be questioned as an expert for the purposes of eliciting his “factual knowledge of’ plaintiffs ease or “establishing the generally accepted medical practice in the community” (McDermott, 15 NY2d at 29-30; see also Harley v Catholic Med. Ctr. of Brooklyn, 57 AD2d 827, 828 [2d Dept 1977] [holding it permissible at EBT to ask defendant pediatrician about the effects on the infant of certain medicines given by codefendant obstetrician during the mother’s labor, inasmuch as such questions did not “bear solely on the alleged negligence of the codefendant physician”]). The notion that a physician witness may be asked what is the “generally accepted medical practice in the community” (the McDermott holding), but not whether some particular act or omission “[w]ould . . . have been good medical practice” (the Carvalho holding), or what good and accepted medical practice would have been or demanded under given circumstances (essentially this case), is unsound if not chimerical.
*330 Some authorities suggest that the real rationale for the restrictive Carvalho rule is to prevent a medical malpractice plaintiff from co-opting at the discovery stage one of the defendant physicians as the plaintiffs own expert for the purpose of establishing the liability of another defendant physician, and indeed to discourage the plaintiff from suing more doctors than necessary or appropriate in order to have at least one physician defendant available to implicate another in the alleged malpractice (see Devine v Pinapati, 19 Misc 3d 1135[A], 2008 NY Slip Op 51011[U], *3-4 [Sup Ct, Albany County 2008]; Giventer v Rementeria, 181 Misc 2d 582, 584-585 [Sup Ct, Richmond County 1999]). However, the very articulation of that rationale for the Carvalho rule — not to mention any plain reading of the McDermott decision itself— would indicate that it is permissible for plaintiff to make his adversary his expert at the trial stage (as opposed to before trial). Moreover, any such attempt to disallow at the discovery stage what is permissible at trial runs directly counter to the express holding of Johnson, which is that any expansionary rule of evidence applicable at trial “obvious[ly]” and “necessarily” governs at the discovery stage as well, since the scope of discovery is, by definition, “at least as broad” as the standard of admissibility of evidence at trial (Johnson, 49 AD2d at 237). Finally, in rendering its decision in Mc-Dermott, the Court of Appeals was willing to “assume[ ] that [the] plaintiff, in naming a doctor as a defendant, ha[d] done so in good faith, on the basis of his relationship with the case and not as a device or subterfuge in order to afford the plaintiff an opportunity to call him as an expert witness” at trial (15 NY2d at 30 n 5). This court sees no reason, either in theory or in relation to this case, why the same assumption should not be indulged at the deposition stage of the action.

.
“[W]here a physician declines [to respond] to a question because it assertedly deals with the treatment by a codefendant, it is his burden to persuade the court that the question solely involves care rendered by another and is wholly irrelevant to what the witness himself did, did not do, knew or should have known. Significantly, where this issue has arisen, the courts typically ruled in favor of a response. It is a rare case where the medical witness can successfully argue that standards of practice in a related specialty are either wholly unknown to him, totally irrelevant to his own care and treatment of a patient, or clearly immaterial to the issue of causation, so justifying his refusal to respond” (Giventer, 181 Mise 2d at 586, quoting Norman Bard and Lori A. Maraño, New York Medical Malpractice § 17.5.9.1, Comment [Bard 1994]).

. Like the aforementioned authorities, Lawson was decided prior to the promulgation of 22 NYCRR part 221.

. At this juncture, the court must confess that it has absolutely no idea what to make of the Fourth Department’s summary affirmance of the order in Lawson. The court has not read the appellate briefs (which have not been sup *332 plied by any party herein), and thus it does not know which party or parties appealed the Lawson order. The court further does not know what aspect or aspects of that order (i.e., the part permitting plaintiff to re-depose certain defendant doctors, and/or the part disallowing further EBTs of certain other defendant doctors) was challenged on appeal in that case. Further, upon reading the order and decision in Lawson, and especially upon considering the interlineations set out in the Lawson order, this court cannot gauge whether Justice Mintz’s analysis of the use of hypothetical questions at depositions supported only that part of the order that permitted the plaintiff to re-depose two of the defendant doctors, or was supportive also of that part of the order disallowing plaintiffs request to re-depose three other of the defendant physicians. For all of the foregoing reasons, the court cannot discern whether any of Justice Mintz’s directives with regard to the use of hypotheticals (and, if so, which of those directives) were even the subject of the appeal. Further, given the general rule that the supervision of pretrial disclosure is a matter entrusted to the broad discretion of the trial court (see Nussbaumer v General Elec. Co., 292 AD2d 873 [4th Dept 2002]; Kern v City of Rochester, 267 AD2d 1026 [appeal No. 1] [4th Dept 1999]), this court cannot rule out that, even if Justice Mintz’s guidelines on the uses of hypothetical questions at depositions were in fact the subject of the appeal in Lawson, and irrespective of what was actually argued on appeal with regard to the permissibility or impermissibility of such questions as a matter of law, the summary affirmance merely signaled the Appellate Division’s view that Justice Mintz’s rulings with regard to those issues were (whichever way they went) sound exercises of his practical discretion in the matter. In sum, given the lack of a discernible ruling by the Fourth Department on the permissibility of asking hypothetical questions at depositions, this court simply cannot proceed from the premise that it is bound in any definitive sense by the outcome on appeal in Lawson.

. The court would have to say that even that narrower prohibition on the use of certain hypotheticals would nonetheless represent an unjustified departure from first principles in this area. In reversing a contrary decision of the trial court, the Johnson court was very clear to observe: “[T]hat the defendant is an ‘expert’ and that the particular questions asked of him [on the examination before trial] are those which only an expert can answer, seem beside the point” (Johnson, 49 AD2d at 237, quoting Rogotzki v Schept, 91 NJ Super 135, 148, 219 A2d 426, 432 [1966] [internal quotation marks omitted]). Similarly, the Court of Appeals has unequivocally stated that a “plaintiff should be permitted to examine his doctor-opponent as fully and freely as other qualified witnesses, and that such testimony could include expert opinion” (Gilly, 69 NY2d at 511, citing McDermott, 15 NY2d at 26-29), and that the decision to ask the defendant witness those questions calling for expert opinion properly “rests with the plaintiff” (McDermott, 15 NY2d at 30).