FILED
07/01/2021
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 2, 2020 Session

## BRITTANY BORNGNE EX REL. MIYONA HYTER v. CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 15C814   J.B. Bennett, Judge**

_____

**No. E2020-00158-COA-R3-CV**

_____

This health care liability action arises from injuries suffered by a minor, Miyona Hyter, during her birth.  Miyona Hyter, a minor by and through her next friend and mother, Brittany Borngne ("Plaintiff") sued, among others, Dr. Michael Seeber who delivered the child via cesarean section and certified nurse midwife Jennifer Mercer who assisted with the birthing process.  Plaintiff alleged that Nurse Mercer was negligent by failing to recognize concerning signs on the fetal monitoring strip and by failing to call Dr. Seeber for assistance sooner than she did.  The Circuit Court for Hamilton County ("the Trial Court"), by agreed order, granted Dr. Seeber partial summary judgment on all claims of direct negligence against him; he remained in the case as a defendant only upon Plaintiff's theory that he was vicariously liable for Nurse Mercer's actions as her supervising physician.  During his deposition, Dr. Seeber declined to answer questions that he argued required him to render an expert opinion regarding Nurse Mercer's care during times that Dr. Seeber was not present and had no involvement in Plaintiff's care.  The Trial Court declined to require Dr. Seeber to answer questions that "call[] for an opinion by Dr. Seeber that asks him to comment on the actions of other healthcare providers and does not involve his own actions, as required by *Lewis v. Brooks*," 66 S.W.3d 883, 887-88 (Tenn. Ct. App. 2001).  After Nurse Mercer's deposition, she submitted an errata sheet that substantively altered her answers to some of the questions.  Plaintiff moved to suppress the errata sheet, arguing that Tenn. R. Civ. P. 30.05 does not allow a witness to make substantive changes to her deposition testimony.  The Trial Court denied the motion but allowed Plaintiff the opportunity to reopen Nurse Mercer's deposition and to fully cross-examine her at trial about the changes.  The case proceeded to trial before a jury, which returned a verdict in Defendants' favor.  We hold that the Trial Court erred by refusing to order Dr. Seeber to answer the questions at issue in his deposition.  Deeming this case distinguishable from *Lewis v. Brooks*, we reverse the Trial Court in its declining to compel Dr. Seeber to testify concerning the conduct of his supervisee, Nurse Mercer, and remand for a new trial.  We

also reverse the Trial Court in its decision to exclude proof of Miyona Hyter's pre-majority medical expenses. We affirm the Trial Court as to the remaining issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, J., joined. KRISTI M. DAVIS, J., filed a separate opinion concurring in part and dissenting in part.

Timothy R. Holton, Memphis, Tennessee, for the appellant, Brittany Borngne ex rel. Miyona Hyter.

Joshua A. Powers and Alexandra E. Weiss, Chattanooga, Tennessee, for the appellee, Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System.

Dixie Cooper and Jordan Gibson, Brentwood, Tennessee, for the appellees, Michael John Seeber, Jennifer Mercer, and Caring Choice Women's Center, P.C.

**OPINION**

**Background**

On March 3, 2014, Plaintiff, who was at term in her pregnancy, was admitted to the hospital for observation and then for induction of labor. She was diagnosed with high blood pressure and at risk for preeclampsia. Plaintiff's delivery began on the evening of March 5, 2014. It was managed by Nurse-midwife Mercer. After about an hour and 48 minutes of pushing, the baby had made no progress from zero station. The fetal heart monitoring strip showed concerning signs that everyone agreed warranted close observation and monitoring. Nurse Mercer called Dr. Seeber around 11:18 p.m. He arrived at the hospital about 45 minutes later, reviewed Plaintiff's chart, and ordered a c-section to be performed as soon as possible. The child was not breathing when she was delivered. She was diagnosed with permanent brain damage as a result of lack of oxygen and suffered severely debilitating injuries.

Plaintiff brought this action in the Trial Court against Dr. Seeber; Nurse Mercer; Sylvia Stephenson (another nurse who provided care during delivery); Caring Choice Women's Center, P.C., their employer; and Chattanooga-Hamilton County Hospital Authority, d/b/a Erlanger Health System. Dr. Seeber moved for summary judgment on the claims of direct negligence against him. The Trial Court granted his motion in an order stating,

2

Plaintiff did not dispute Dr. Seeber's motion and argument. . . .[A]ll claims of direct negligence asserted against Dr. Seeber are hereby dismissed with prejudice.

The only remaining claim against Dr. Seeber is under Plaintiff's theory that he is vicariously liable for the actions of Jennifer Mercer, C.N.M., by virtue of his role as her supervising physician.

During Dr. Seeber's deposition, defense counsel stated that he "has asserted *Lewis v. Brooks* and will not be commenting on the standard of care of the nurses, either directly or indirectly." Dr. Seeber testified in pertinent part as follows:

Q: What would your expectation of Mercer be if you had a patient of your group with minimal variability and late for an hour? What would you expect?
A: It depends . . . if Jennifer Mercer is aware of this, that's one thing. And if Jennifer Mercer is unaware of this is another thing. And I don't know whether she's aware or not so I can't really −I can't really say.
Q: Let's take it −assume she was aware of it. What would your expectation be? Late −
[Defense counsel:] . . . I'm going to object to this and instruct him not to answer. You're asking for an opinion.
Q: What would your expectation of your employee, the one you're supervising, be in this scenario?
[Defense counsel:] Same objection. Instruct him not to answer.

\* \* \*

Q: Well, according to your practice, would you have expected her to tell you that they had had late and minimal variability for an hour?

\* \* \*

A: So your question is −Jennifer Mercer called me . . . at a time when she felt it was appropriate to call me. And that was when a combination of a lack of progress and concern about the fetal heart tones made −made it in her opinion necessary for me to come see this patient. And that's what −that's exactly what she's supposed to do.

\* \* \*

3

Q: Would it concern you that your patient had been in the hospital with minimal variability and lates for more than an hour before someone bothered to call you?

\* \* \*

[Defense counsel:] No.  I'm instructing him not to answer.
[Plaintiff's counsel:] All right.  We're going to adjourn.

After they adjourned the deposition, Plaintiff filed a motion to compel Dr. Seeber to answer the questions, arguing that "the facts in this case are not analogous to the fact situation presented in *Lewis* and Dr. Seeber should be required to answer without limitation."  The Trial Court denied the motion, ruling as follows, in pertinent part:

[T]he question calls for an opinion by Dr. Seeber that asks him to comment on the actions of other healthcare providers and does not involve his own actions, as required by *Lewis v. Brooks*. . . . Dr. Seeber is not required to answer it.

The Court further finds that hypothetical questions posed to Dr. Seeber about actions of other individuals or circumstances involving patient care while he was not involved in the patient's care, are not permissible under *Lewis v. Brooks*[.]

\* \* \*

[Dr. Seeber] is prohibited from rendering opinions about the care provided by others unless and until he is designated as an expert witness pursuant to the requirements of TRCP 26.  In the event Dr. Seeber is so designated, he may be deposed as an expert witness and the costs/expenses referenced hereinafter shall not apply.

Regarding Defendants' Motion to Quash Dr. Seeber's deposition, the Motion is granted in part and denied in part.  The Court finds that the Plaintiff may reconvene Dr. Seeber's deposition to ask any additional questions of Dr. Seeber not previously asked but only to the extent the questions address Dr. Seeber's direct involvement and actions in the care and treatment of [Plaintiff] and her daughter, Miyona Hyter . . .

The Motion to Quash is granted in so far as it seeks to prohibit the Plaintiff from asking questions that are governed by *Lewis v. Brooks*. . . .

4

Moreover, because the Plaintiff was given the opportunity to ask all the questions she wanted to ask about Dr. Seeber's own actions and involvement in the care and treatment of [Plaintiff] during his first deposition, and her counsel refused to do so and instead adjourned the deposition to seek a ruling by the Court on the question at issue, . . . she should be required to pay for all expenses . . . incurred by Dr. Seeber associated with reconvening his deposition as well as the attorney's fees incurred by his counsel in filing that portion of the Motion to Quash which was granted as to Dr. Seeber.

Nurse Mercer submitted an errata sheet after her deposition in which she made changes to her testimony pursuant to Tenn. R. Civ. P. 30.05. Some of the changes were material and substantive, and some were more simple corrections of obvious misstatements. Nurse Mercer provided explanations for her changes on the errata sheet and in an affidavit. The Trial Court denied Plaintiff's motion to strike or suppress the proposed changes based on its judgment that Rule 30.05, which by its express terms allows "[a]ny changes in form or substance which the witness desires to make," authorizes the proposed changes by Nurse Mercer made after her deposition.

Dr. Marla Sammer is a pediatric radiologist who treated Miyona Hyter by reviewing her cranial ultrasound, CT, and MRI scans. Plaintiff filed Dr. Sammer's sworn declaration in which she opined that "Ms. Hyter most likely suffered from severe hypoxic ischemic encephalopathy that occurred at or around the time of her birth." Defendants moved to exclude Dr. Sammer's testimony, arguing that Plaintiff had failed to timely disclose that she would be offering her expert opinion on the timing and causation of the injuries. The Trial Court denied the motion but also ruled that Defendants would be allowed to take a discovery-only deposition of Dr. Sammer that "cannot be used as evidence at the trial of this matter by any party, but may be used for cross-examination of Dr. Sammer." The court noted that "[n]o objection was made by Plaintiff at any time during the . . . hearing regarding Defendants' request to take a discovery-only deposition. . . ."

By this time, Dr. Sammer had moved to Texas. She filed a motion in a Texas court to quash the subpoena for her deposition. This prompted Defendants to again ask the Trial Court to exclude her as a trial witness. The Trial Court ordered as follows:

If the Motion to Quash pending in the Texas Court is denied[, the] deposition shall occur no later than May 16, 2019. If the Motion to Quash is granted, . . . or if the deposition does not occur due to some other legal procedure, then the Court will convene a *McDaniel* hearing before trial to carry out the Court's "gatekeeper" function[.] To accommodate Dr. Sammer, the said hearing may proceed via video conference with Dr. Sammer at a remote location. . . The Court will also try to accommodate Dr. Sammer by allowing

5

a combination of the offered *McDaniel* hearing dates and times, such that the hearing could begin on one of the offered dates and times, recess, and then resume until conclusion on another of the offered dates and times.

(Footnotes in original omitted).

The Texas court denied Dr. Sammer's motion to quash the subpoena. Her attorney then sent a letter to defense counsel stating,

The time commitment imposed by your firm has made [Dr. Sammer's] participation impossible. Dr. Sammer is not able to testify at trial, even though she was willing, because of the time commitment your firm imposed.

This will confirm our agreement that you have removed your request for the deposition of Dr. Sammer, if and only if, she agreed not to testify at trial.

The jury trial was conducted in late May and early June of 2019. The jury returned a verdict finding that neither Nurse Mercer nor Nurse Stephenson deviated from recognized standards of acceptable professional practice. Plaintiff filed a motion for a new trial, which the Trial Court denied. Plaintiff timely appealed to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises the following issues on appeal: 1) whether the Trial Court erred in failing to quash, suppress, or strike Nurse Mercer's errata sheet testimony; 2) whether the Trial Court erred in "imposing onerous and burdensome conditions on the testimony of Dr. Sammer"; 3) whether the Trial Court erred in refusing to compel Dr. Seeber to answer questions regarding his expert opinion about the care and treatment provided by Nurse Mercer to Plaintiff pursuant to *Lewis ex rel. Lewis v. Brooks*, 66 S.W.3d 883 (Tenn. Ct. App. 2001); and, 4) whether the Trial Court erred in excluding proof of Miyona Hyter's pre-majority medical expenses.

The issues on appeal primarily involve the Trial Court's pretrial decisions regarding discovery and admissibility of evidence. "In Tennessee admissibility of evidence is within the sound discretion of the trial judge. When arriving at a determination to admit or exclude even that evidence which is considered relevant[,] trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion." *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992); *accord Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) ("Because decisions

6

regarding pretrial discovery are inherently discretionary, they are reviewed using the 'abuse of discretion' standard of review."). As our Supreme Court explained in *Lee Med., Inc.*,

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

> Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42.

*Lee Med., Inc.*, 312 S.W.3d at 524. We "review the lower court's legal determinations de novo without any presumption of correctness." *Id.* at 525.

The first issue we address is whether the Trial Court erred in failing to quash, suppress, or strike Nurse Mercer's errata sheet testimony. After reviewing the transcript of her deposition, Nurse Mercer submitted an errata sheet making 24 changes to her testimony and explaining the reasons for the changes. The reasons included "clarification

of answer," "misspoke," and "more accurately answers the questions." Some of the changes involve a correction to an obvious misstatement that was not caught at the time. For instance, the first two changes involve Nurse Mercer's testimony as to what time she called Dr. Seeber. She answered "yes" to the question, "we do know that you called him ultimately at 2218 [10:18 p.m.] . . . because that's in here?" But other testimony and evidence in the record, including notes taken by the nurses, shows that Nurse Mercer actually called at 2318 military time, or 11:18 p.m. Her errata sheet shows the correct time. Some changes are relatively minor, as when she changed her answer from "potentially" to "not likely" and from "based on what the nurse documented, based on the fetal strip" to simply, "based on what the nurse documented." Other changes involved more substantive alterations of Nurse Mercer's interpretations of the fetal heart monitoring strip. She filed an affidavit attempting to explain the post-deposition changes, in which she stated:

> In reviewing the transcript of my deposition testimony to insure I had accurately testified about the facts and my opinions regarding the fetal heart tracing [FHT] in this case, I pulled out the section of the tracing where I was being asked questions and as I reviewed the decelerations that I marked "indeterminate" I could tell from looking at my copy of the FHT that although the tracing broke up and stopped tracing briefly, the portion of the fetal heart rate I could see, in combination with where the lowest place on the tracing the fetal heart rate shows up, indicates clearly that the fetal heart rate decelerations dropped abruptly. Consistent with my testimony that an abrupt drop in the fetal heart rate from baseline is a variable deceleration, I made the changes to my copy of the FHT that I had marked during the deposition, changing my label from "indeterminate" to "variable" or "likely variable" on each deceleration where I could see evidence of the fetal heart rate decelerating from baseline and the fetal heart rate picking up again at the bottom of the deceleration such that drawing a line between the two "pieces" of tracing, creates an abrupt drop in the heart rate from the baseline, which, by definition is a variable deceleration.

> All of the other changes I made to my errata sheet were because the answer I gave was unclear, I misunderstood the question, or I misspoke.

(Brackets in original, format modified).

Plaintiff filed a motion to suppress or strike Nurse Mercer's changed testimony in her errata sheet. In the alternative, she argued that the Trial Court should allow the use of her original testimony as substantive proof, that she "should be allowed to be impeached under her self-serving changes to her testimony," and that Nurse Mercer's deposition should be reopened to allow inquiry into the reason for her changed testimony. The Trial

Court denied the motion but allowed Plaintiff the opportunity to reopen Nurse Mercer's deposition to "inquire about the reasons for the changes to the deposition testimony . . . and the source of the changes, such as whether they came from Ms. Mercer herself or her counsel[.]" The Trial Court also allowed Plaintiff to fully cross-examine Nurse Mercer at trial about the errata sheet changes to her testimony.

Plaintiff argues on appeal that the Trial Court erred in allowing Nurse Mercer to submit "an errata sheet to her deposition that changed entirely the substance and meaning of her testimony." Tennessee Rule of Civil Procedure 30.05 provides as follows in pertinent part:

> When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by the witness, unless such examination and reading are waived by the witness and by the parties. *Any changes* in form *or substance* which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them.

(Emphasis added). Tennessee appellate courts have not had the opportunity to consider the issue presented here. Federal Rule of Civil Procedure 30(e)(1) is similarly but not identically worded, and so the decisions of federal courts construing the parallel rule are potentially persuasive authority. *See Thomas v. Oldfield*, 279 S.W.3d 259, 262 n. 3 (Tenn. 2009) ("We may look to the interpretation of comparable federal rules for guidance"). A number of federal jurisdictions have considered the question of whether substantive changes in an errata sheet submitted after a deposition may be allowed, and they appear to be fairly evenly divided in their conclusions. Most of the courts refusing to allow such changes have quoted and applied the reasoning of *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992), which stated:

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.

*See also, e.g.*, *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n. 5 (10th Cir. 2002) (stating, in dicta, "we . . . do not approve of the use of such altered testimony that is controverted by the original testimony"); *E.I. DuPont De Nemours & Co. v. Kolon Indus.*,

277 F.R.D. 286, 296-98 (E.D. Va. 2011) (discussing "two basic approaches reflected in the decisional law" and adopting stricter approach); *Touchcom, Inc. v. Bereskin & Parr*, 790 F.Supp.2d 435, 465 (E.D. Va. 2011) (striking errata sheet changes it found "tactical" and "a bit too convenient"); *Wyeth v. Lupin Ltd.*., 252 F.R.D. 295, 296-97 (D. Md. 2008); *Coleman v. S. Pac. Trans. Co.*, 997 F. Supp. 1197, 1201 (D. Ariz. 1998); *Rios v. Bigler*, 847 F. Supp. 1538, 1546-47 (D. Kan. 1994) ("The court will only consider those changes which clarify the deposition, and not those which materially alter the deposition testimony as a whole"); *Barlow v. Esselte Pendaflex Corp.*, 111 F.R.D. 404, 406 (M.D.N.C. 1986) (denying changes where "[b]y virtue of either the sheer number of changes, or the cutting, pasting and mutilation, plaintiff has effectively destroyed her deposition and sabotaged the deposition process").

Other federal courts have interpreted Fed. R. Civ. P. 30(e) to allow subsequent substantive changes to deposition testimony. *See, e.g., Hernandez v. Rush Enter., Inc.*, 336 F.R.D. 534, 535-36 (E.D. Tex. 2020) (stating "[t]he majority of federal courts place no limit on the nature of the changes a witness may make to the substance of his testimony") (quoting *Raytheon Co. v. Indigo Sys. Corp.*, No. 4:07-CV-109, 2009 WL 424773, at *2 (E.D. Tex. Feb. 18, 2009)); *EBC, Inc. v. Clark Bldg. Sys.*, 618 F.3d 253, 270 (3rd Cir. 2010) ("nothing . . . requires courts to strike contradictory errata if sufficiently persuasive reasons are given, if the proposed amendments truly reflect the deponent's original testimony, or if other circumstances satisfy the court that amendment should be permitted"); *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2nd Cir. 1997) ("'[t]he language of the Rule places no limitations on the type of changes that may be made[,] . . . nor does the Rule require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes'—even if those reasons 'are unconvincing.'") (quoting *Lugtig v. Thomas*, 89 F.R.D. 639, 641 (N.D. Ill. 1981)) (brackets and ellipses in original); *Devon Energy Corp. v. Westacott*, No. H-09-1689, 2011 WL 1157334, at *5-6 (S.D. Tex. Mar. 24, 2011) ("the strict approach to changes under Rule 30(e) is unpersuasive"); *Foutz v. Town of Vinton, Va.*, 211 F.R.D. 293, 295 (W.D. Va. 2002).

The federal district courts within the Sixth Circuit are also split on this question. *See Trout v. FirstEnergy Corp.*, 339 F. App'x 560, 565-66 (6th Cir. 2009) (stating "Rule 30(e) does not allow one to alter what was said under oath" but affirming where "the district court gave [plaintiff] the benefit of her corrected deposition testimony"); *compare Lanton v. Ocwen Loan Serv., LLC*, No. 3:15-cv-372, 2018 WL 4030540, at *5 (S.D. Ohio June 29, 2018) (disallowing changes while recognizing that "*Trout* did not expressly rule on whether Rule 30(e) prevents substantive alterations to testimony") (vacated in part on other grounds by *Lanton v. Ocwen Loan Serv., LLC*, 793 Fed.Appx. 398 (6th Cir. 2019)); *Lewis v. Hawkins*, No. 3:16-CV-315-TAV-HBG, 2017 WL 4322825, at *5-6 (E.D. Tenn. Sept. 28, 2017) ("the majority of recent decisions within the Sixth Circuit consistently interpret *Trout* as establishing a rule that an errata sheet may not be used for substantive changes to

10

testimony") (quoting *Ramirez v. Bolster & Jeffries Health Care Grp., LLC*, No. 1:12-CV-00205-GNS, 2016 WL 4132294, at *3 (W.D. Ky. Aug. 3, 2016)); *Walker v. 9912 E. Grand River Assoc., LP*, No. 11-12085, 2012 WL 1110005, at *3 (E.D. Mich. Apr. 3, 2012); *EEOC v. Skanska USA Bldg, Inc.*, 278 F.R.D. 407, 411 (W.D. Tenn. 2012), *with Buchanan v. City of Mt. Juliet*, No. 3:11-0265, 2012 WL 13034546, at *1-2 (M.D. Tenn. Sept. 26, 2012) (allowing changes "[g]iven the widely divergent case law . . . and the lack of a controlling published Sixth Circuit opinion," applying "dictionary definition" of the term "substance"); *Hodak v. Madison Capital Mgmt., LLC*, No. 5:07-cv-05-JMH, 2008 WL 2598309, at *2 (E.D. Ky. June 25, 2008) ("a broader interpretation of Rule 30(e) is correct when it is applied to changes made to deposition testimony through an errata sheet"); *Jermano v. Graco Children's Prods. Inc.*, No. 13-cv-10610, 2015 WL 1737548, at *2 (E.D. Mich. Apr. 16, 2015) ("it is not crystal clear in this Circuit that a deponent cannot make substantive changes to his deposition testimony under Rule 30(e)").

As several courts addressing this question have noted, "[g]ood arguments can be made on both sides." *Buchanan*, 2012 WL 13034546, at *1. We conclude that the Trial Court did not err in allowing the substantive changes to Nurse Mercer's testimony, for several reasons. First, and most importantly, the plain and clear language of Tenn. R. Civ. P. 30.05 expressly allows "[a]ny changes in form or substance which the witness desires to make. . . ." As the Supreme Court has stated, "[a]lthough the rules of civil procedure are not statutes, the same rules of statutory construction apply in the interpretation of rules." *Thomas*, 279 S.W.3d at 261. Our goal is to ascertain and give effect to the Supreme Court's intent in promulgating the rule without unduly restricting or expanding its coverage beyond its intended scope. *Id.* "We achieve this objective by examining the text, and if the language is unambiguous, we simply apply the plain meaning of the words used." *Fair v. Cochran*, 418 S.W.3d 542, 544 (Tenn. 2013).

The plain meaning of the word "any" is clear. *See Amer. Heritage Apts., Inc. v. Hamilton Cnty. Water & Wastewater Treatment Auth.*, No. E2017-01307-COA-R9-CV, 2018 WL 4150875, at *6 (Tenn. Ct. App. Aug. 29, 2018) ("Any means any."), *no appl. perm. appeal filed* (quoting *U.S. v. Winans*, 748 F.3d 268, 272 (6th Cir. 2014)). In *Buchanan*, the court applied the dictionary definition of "substance" as follows:

> *Black's Law Dictionary*, 7th Ed. lists as the first definition of substance: "The essence of something; the essential quality of something, as opposed to its mere form . . ." Thus, the plain definition of the word substance means that it is something more than mere form, such as an incorrect spelling of a name.

2012 WL 13034546, at *1; *see also, e.g., Hernandez*, 336 F.R.D. at 536 ("the text of Rule 30(e) is clear-cut . . . The rule does not specify which changes are permissible or treat certain changes differently than others"). If we were to apply Rule 30.05 as Plaintiff

11

suggests, we would effectively be rewriting it from saying "any changes in substance are allowed" to "some, but not all, changes are allowed." While we understand the concerns expressed by Plaintiff, the language of Rule 30.05 is clear and unambiguous, and it is not the role of this Court to rewrite the Rule.

Second, the safeguards allowed by the Trial Court in this case serve to temper the legitimate concern that a deponent may try to change his or her prior testimony as a tactical strategy rather than a correction of a legitimate error. Here, Nurse Mercer's original answers remained part of the record as admissible proof, and the Trial Court allowed Plaintiff the opportunity to reconvene Nurse Mercer's deposition to ask her about the changes. Plaintiff also was allowed to cross-examine Nurse Mercer at trial about the errata sheet changes. Courts have recognized these safeguards to be a likely sufficient deterrent to merely tactical errata sheet alterations. *See Hernandez*, 336 F.R.D. at 536; *Podell*, 112 F.3d at 103; *Foutz*, 211 F.R.D. at 295; *Lugtig*, 89 F.R.D. at 642 ("The Rule is less likely to be abused if the deponent knows that all the circumstances−the original answers as well as the changes and the reasons−will be subject to examination by the trier of fact").[1] We affirm the Trial Court's judgment interpreting Tenn. R. Civ. P. 30.05 to allow Nurse Mercer's proposed errata sheet changes to her deposition testimony under the circumstances presented in this case including what the Trial Court allowed Plaintiff to do to address Nurse Mercer's changes.

The next issue we address is whether the Trial Court erred in "imposing onerous and burdensome conditions on the testimony of Dr. Sammer." In its order denying a new trial, the Trial Court summarized the procedural history and its rulings on this issue as follows:

> Dr. Sammer claimed via a declaration that she arrived at diagnosis opinions as part of her care and treatment. Although these potentially pertinent findings and opinions were never communicated to others in the medical record, Dr. Sammer claimed for the first time on New Year's Eve (December 31, 2018) before a February 5th trial date that she held such opinions, and that she had formed such opinions as "part of [her] care and treatment," thereby allowing her to avoid expert witness requirements. The Court, in exercising its necessary gatekeeping role, wanted these opinions vetted before a jury trial was held on the issues.

---

[1] We emphasize that this case does not present a situation where a party has tried to either obtain or defeat summary judgment by changing his or her testimony, and we need not address that issue at this time. Plaintiff argues in her brief that "had the testimony not been allowed to be changed, partial summary judgment for [her] on the issue of Mercer's deviation from the standard of care would have been appropriate." Defendants respond by pointing out that "such a motion was never filed" and that Plaintiff prevailed on Defendants' motion for summary judgment on behalf of Nurse Mercer.

The Court determined that allowing Dr. Sammer's unvetted, previously unreported opinions against her former employer during a jury trial would be overly oppressive. The Court, therefore, followed Tennessee Rule of Civil Procedure 26 rather than Rule 32, to allow the protection of obtaining a discovery deposition. . . .

Furthermore, though the Court had the option of conducting a McDaniel hearing, the more judicially economical option was to have Dr. Sammer submit to a discovery deposition . . . pursuant to Rule 26.03 . . . rather than an ordinary deposition under Rule 32. . . . [A] discovery-only deposition would have served the same purpose as a McDaniel hearing, with more judicial economy for the Court and less burden on the witness herself, because it would not have required her to attend a separate hearing.

\*     \*     \*

The Court bent over backwards to avoid excluding Dr. Sammer and to create a path which would allow her to testify. For instance, in case the Texas court had quashed Dr. Sammer's deposition subpoena, the Court provided numerous dates and times for a McDaniel hearing and would have allowed Dr. Sammer to mix and match dates and times to better fit her schedule (*e.g.*, the hearing could have started one day, continued on another, and finished on a third day). The Court was also amenable to allowing Dr. Sammer to appear for a McDaniel hearing telephonically. Then, when the Texas court ordered Dr. Sammer to appear at the deposition, there were two separate courts ordering Dr. Sammer to appear for a deposition. At that point, Dr. Sammer **voluntarily** and **unilaterally** chose not to testify at trial, rather than have her previously unreported opinions adverse to her former employer be properly vetted.

The Court did not say the failure to give a deposition would result in exclusion of the witness, only that it may result in the exclusion of the witness. Dr. Sammer would have been allowed to have a path to testify to a jury. . . . If she continued to resist, the Court would have employed its last resort by allowing a McDaniel hearing the same morning that she would have testified before the jury. However, Dr. Sammer chose not to testify before the jury. At that point, the option of conducting a McDaniel hearing was taken away from the Court.

13

Moreover, Plaintiff did not object to the Court's offer of the discovery deposition and, although the Court asked more than once, there was no actual prejudice ever clearly and specifically articulated by Plaintiff.

(Emphasis in original). The Trial Court concluded that "it did not err in excluding Dr. Sammer's testimony," and denied Plaintiff's request for a new trial on this ground.

The documents in the record support the Trial Court's characterization that it "bent over backwards to avoid excluding Dr. Sammer" and to allow her to testify. For her part, Dr. Sammer went to extensive lengths to avoid testifying, including hiring her own counsel in Texas to try to quash the deposition subpoena. As we have noted, "it is well settled that decisions with regard to pre-trial discovery matters rest within the sound discretion of the trial court." *Willeford v. Klepper*, 597 S.W.3d 454, 470 (Tenn. 2020) (quoting *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992) (internal quotation marks omitted)). The Trial Court did not abuse its discretion in making decisions regarding Dr. Sammer's testimony. It does not appear that the conditions imposed on her were so "onerous" or "burdensome" that her decision not to testify was compelled by the Trial Court.

We next address whether the Trial Court erred in refusing to compel Dr. Seeber to answer questions regarding his expert opinion about the care and treatment provided by Nurse Mercer to Plaintiff pursuant to *Lewis v. Brooks*. The Trial Court declined to compel Dr. Seeber to testify as to his opinion of the medical care rendered by Nurse Mercer at times when Dr. Seeber was not directly involved with Plaintiff's medical treatment. The Trial Court ruled that Dr. Seeber was not required to answer a question that "calls for an opinion . . . that asks him to comment on the actions of other healthcare providers and does not involve his own actions, as required by *Lewis v. Brooks*."

The *Lewis* case similarly involved an injury to an infant during the child's delivery. 66 S.W.3d at 884. The plaintiff in *Lewis* alleged that "Dr. Moore and Dr. Lawrence were negligent in selecting Dr. Brooks," who delivered the child, "to cover for them when they were not on duty." *Id.* This Court stated:

Ms. Lewis argues that the trial court erred in limiting discovery as to the opinions of Dr. Moore and Dr. Lawrence. Sometime before the depositions of Dr. Moore and Dr. Lawrence were to be taken, Ms. Lewis' counsel was advised that the defendant doctors would refuse to answer questions calling for opinions as to the treatment of Ms. Lewis by other defendant doctors and nurses. Ms. Lewis filed a Motion to Compel. The trial court denied the motion, ruling that Defendants Moore and Lawrence would only be required to testify as to opinions expected to be rendered at trial or opinions relating to their own actions.

14

*Id.* at 887.  Upon the plaintiff's appeal, the *Lewis* Court held:

> we note that Dr. Moore and Dr. Lawrence were not listed as expert witnesses by either party.  They were simply party defendants who are "experts" by nature of their chosen field.  Under the facts of the instant case, we do not find that their expertise is subject to compulsion.  As a result, we find that the trial court did not err when it refused to compel Dr. Moore and Dr. Lawrence to answer questions outside the realm of their own actions and opinions that they expected to render at trial.

*Id.* at 888.

In *Burchfield v. Renfree*, No. E2012-01582-COA-R3-CV, 2013 WL 5676268 (Tenn. Ct. App. Oct. 18, 2013), *no appl. perm. appeal filed*, the Court considered and applied *Lewis* in a case where the plaintiffs tried to subpoena an expert witness, Dr. Calundruccio, who was originally retained by a defendant doctor, to take his deposition, against his wishes.  Dr. Calundruccio filed an affidavit stating, "I do not wish to provide further expert testimony in this case and am not in agreement to be deposed.  I am not a treating physician in this case."  *Id.* at *24.  The *Burchfield* Court stated:

> Applicable to this case is this Court's opinion in *Lewis v. Brooks*, 66 S.W.3d 883, 887 (Tenn. Ct. App. 2001), wherein it was explained that doctors who were party defendants in the case could not be compelled to answer questions in discovery regarding their opinions of the treatment given by other doctors.  Determining that there were no Tennessee cases specifically on point, this Court relied upon a Pennsylvania case styled *Pennsylvania Co. v. City of Philadelphia*, 105 A. 630 (1918).

*Id.* at *25.  *Burchfield* quoted the Pennsylvania case as follows, in pertinent part:

> The process of the courts may always be invoked to require witnesses to appear and testify to any facts within their knowledge; but no private litigant has a right to ask them to go beyond that. . . . [T]he private litigant has no more right to compel a citizen to give up the product of his brain, than he has to compel the giving up of material things.  In each case it is a matter of bargain, which, as ever, it takes two to make, and to make unconstrained.

*Id.*  The *Burchfield* Court held that "the trial court was correct in its determination that Dr. Calundruccio could not be compelled to provide testimony as an expert against his will.

Where the expert's agreement to serve in such capacity has been withdrawn, there is no authority for compelling the expert to 'give up the product of his brain.'" *Id.*

In *Waterman v. Damp*, No. M2005-01265-COA-R3-CV, 2006 WL 2872432, at *9-10 (Tenn. Ct. App. Oct. 9, 2006), *R. 11 appl. perm. appeal dismissed Feb. 26, 2007*, the Court addressed the issue of whether a defendant doctor, Dr. Damp, could be compelled to answer questions of whether his own allegedly negligent conduct conformed to the applicable standard of care in his expert opinion. Observing the well-established principle that "[o]rdinarily, proof of malpractice requires the use of expert testimony concerning the applicable standard of care and the defendant's breach," and noting that "[o]ccasionally, . . . such proof comes by way of the defendant himself," *id.* at *9, the *Waterman* Court stated:

> Relative to the applicable standard of care for an emergency room physician in Nashville, Tennessee, it is Dr. Damp's own deposition testimony that is critical to the survival of Plaintiff's case on summary judgment. Such use by Plaintiff of a defendant doctor's own testimony is appropriate for reasons explained by the Court of Appeals of New York.
>
> > While recognizing the right of a plaintiff in a malpractice action to call as a witness the defendant doctor, the courts of several states have sought to limit the type of questions which the plaintiff may put to him. Specifically, it has been held that a defendant physician may be required to testify to 'facts within his knowledge[;]' that is, 'what (he) actually saw and did' but not as to whether his actions deviated from the accepted standard of medical practice in the community, a matter deemed to call for 'expert opinion.' (*Hull v. Plume*, 131 N.J.L. 511, 516-517, 37 A.2d 53; *see, also, Osborn v. Carey*, 24 Idaho 158, 168, 132 P. 967; *Hunder v. Rindlaub*, 61 N.D. 389, 406-410, 237 N.W. 915; *Forthofer v. Arnold*, 60 Ohio App. 436, 441-442, 21 N.E.2d 869; *cf. Ericksen v. Wilson*, 266 Minn. 401, 123 N.W.2d 687.) Other courts, however, permit the plaintiff to examine his doctor-opponent as freely and fully as he could any other qualified witness. (*See Lawless v. Calaway*, 24 Cal.2d 81, 90-91, 147 P.2d 604; *State for Use of Miles v. Brainin*, 224 Md. 156, 167 A.2d 117, 88 A.L.R.2d 1178; *cf. Snyder v. Pantaleo*, 143 Conn. 290, 122 A.2d 21.)
> >
> > The latter decisions strike us as the more enlightened. That the defendant is an 'expert' and that the particular

16

questions asked of him are those which only an expert can answer, seem beside the point. It is at least arguable that the doctor's knowledge of the proper medical practice and his possible awareness of his deviation from that standard in the particular case are, in a real sense, as much matters of 'fact' as are the diagnosis and examination he made or the treatment upon which he settled. More importantly, however, by allowing the plaintiff to examine the defendant doctor with regard to the standard of skill and care ordinarily exercised by physicians in the community under like circumstances and with regard to whether his conduct conformed thereto, even though such questions call for the expression of an expert opinion, the courts do no more than conform to the obvious purpose underlying the adverse-party-witness rule. That purpose, of course, 'is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action.' (*State for Use of Miles v. Brainin*, 224 Md. 156, 161, 167 A.2d 117, 119, *supra; see, also, Lawless v. Calaway*, 24 Cal.2d 81, 90, 147 P.2d 604, *supra*.) The issue whether the defendant doctor deviated from the proper and approved practice customarily adopted by physicians practicing in the community is assuredly 'pertinent and relevant' to a malpractice action. Indeed, absent such proof, the plaintiff's case would have to be dismissed. Moreover, evidence on this issue is, in most instances, 'available' from the defendant doctor.

The importance of enabling the plaintiff to take the testimony of the defendant doctor as to both 'fact' and 'opinion' is accentuated by recognition of the difficulty inherent in securing 'independent' expert witnesses. It is not always a simple matter to have one expert, a doctor in this case, condemn in open court the practice of another, particularly if the latter is a leader in his field. In consequence, the plaintiff's only recourse in many cases may be to question the defendant doctor as an expert in the hope that he will thereby be able to establish his malpractice claim.

*McDermott v. Manhattan Eye, Ear & Throat Hospital et al.*, 15 N.Y.2d 20, 255 N.Y.S.2d 65, 203 N.E.2d 469, 473-4 (N.Y. 1964).

17

*Waterman*, 2006 WL 2872432, at \*9-10.

The *Waterman* decision places Tennessee among those jurisdictions recognizing that medical experts alleged to have injured a patient by their own direct causal negligence may be compelled to answer questions as to whether their conduct conformed to the applicable standard of care. *See McDermott*, 203 N.E.2d 469, 473-74 (N.Y. 1964) and cases cited therein; *Ransom v. Radiology Specialists of the Nw.*, 425 P.3d 412, 421 (Or. 2018) (stating "we align ourselves with other courts that permit a plaintiff to question a physician whose conduct is at issue in a medical negligence action about the physician's conduct, even if such questions call for their opinion…"); *Parker v. Poole*, 111 A.3d 101, 107 (N.J.Super.A.D. 2015); *Carney-Hayes v. Nw. Wisconsin Home Care, Inc.*, 699 N.W.2d 524, 529 (Wis. 2005) ("A medical witness who is alleged to have caused injury to the plaintiff by her medical negligence may be required to give her opinion on the standard of care governing her own conduct"); *Abbey v. Jackson*, 483 A.2d 330, 333-34 (D.C. App. 1984) ("Nor do witnesses with personal knowledge of relevant facts have a right to refuse to testify on the ground that the answer will be 'expert' evidence and they have received no expert witness fee"); *Webb v. Priest*, 413 So.2d 43, 46 (Fla. App. 1982); *Wilkinson v. Vesey*, 295 A.2d 676, 682 (R.I. 1972); *Anderson v. Florence*, 181 N.W.2d 873, 876 (Minn. 1970); *Iverson v. Lancaster*, 158 N.W.2d 507, 521-22 (N.D. 1968); *Dark v. Fetzer*, 149 N.W.2d 222, 224 (Mich. App. 1967); *Oleksiw v. Weidener*, 207 N.E.2d 375, 377 (Ohio 1965). Although in the mid-1960s there was a split of opinion on this question as noted in *McDermott*, many jurisdictions have reconsidered it since then, and it can be fairly said that a large majority of jurisdictions now follow a rule similar to the one recognized in Tennessee by *Waterman*. *See, e.g.*, *Anderson*, 181 N.W.2d at 875 (noting "an almost unanimous shift of authority").

*Lewis* stands for the proposition that "doctors who [a]re party defendants in the case [may] not be compelled to answer questions in discovery regarding their opinions of the treatment given by other doctors." *Burchfield*, 2013 WL 5676268 at \*25. Courts in other jurisdictions have reached differing conclusions on this issue; the Iowa Supreme Court has aptly stated that "[t]he cases concerning the compulsion of expert testimony vary greatly depending on the factual situations presented and the legal approach taken." *Mason v. Robinson*, 340 N.W.2d 236, 240 (Iowa 1983). A number of states follow a similar approach to that taken by this Court in *Lewis*. *See, e.g., Ransom*, 425 P.3d at 421 ("plaintiff would not be entitled to ask, and the radiologists would not be required to answer, any questions whatsoever about matters in which the radiologists did not participate"); *Devine v. Pinapati*, 862 N.Y.S.2d 814, 2008 WL 2128135, at \*2 (Sup. Ct. Albany Co. May 21, 2008) ("in a medical malpractice action, a co-defendant physician may not be deposed about the actions of another co-defendant physician if the questions posed relate solely to the alleged negligence of the co-defendant and not to the actions of the witness"); *Carney-Hayes*, 699 N.W.2d at 529 ("Subject to [a] compelling need exception . . . , a medical witness who is

18

unwilling to testify as an expert cannot be forced to give her opinion of the standard of care applicable to another person or her opinion of the treatment provided by another person"); *Abbey*, 483 A.2d at 333-34 ("this argument [restricting expert testimony] has no merit where the witness is not an expert hired by the adversary but is the adversary himself or defense witnesses actually involved in the events from which the claim arose"); *Jistarri v. Nappi*, 549 A.2d 210, 218 (Pa. Super. 1988). Some of the appellate courts that have reversed a trial court's decision to refuse to compel a defendant doctor's expert testimony decided cases that involved only the conduct of the defendant doctor. *See Anderson*, 181 N.W.2d at 877; *Oleksiw*, 207 N.E.2d at 377. Other cases involved more than one defendant doctor, but the appellate court did not discuss or analyze a distinction between a doctor's expert opinion regarding his or her own conduct, as opposed to that of other treating medical professionals. *See McDermott*, 203 N.E.2d at 470-71; *Dark*, 149 N.W.2d at 223; *Webb*, 413 So.2d at 45; *Wilkinson*, 295 A.2d at 680.

In the present case, as already noted, Dr. Seeber's own conduct in providing medical care is not alleged to have caused Plaintiff's injury. Plaintiff did not oppose summary judgment in Dr. Seeber's favor on all claims of direct causal negligence against him. Dr. Seeber's only potential liability stemmed from the argument that he was vicariously liable for Nurse Mercer's actions because of actual or apparent agency. Defendants argue that the Trial Court correctly applied the holding in *Lewis*. Plaintiff argues that *Lewis* is distinguishable because of Dr. Seeber's status as Nurse Mercer's supervisor.

The parties stipulated that "Jennifer Mercer was an employee of Caring Choice Women's Clinic" and that "Dr. Michael Seeber was Jennifer Mercer's supervising physician at the time she provided care to [Plaintiff] for the labor and delivery on 3/5/14 and 3/6/14." Dr. Seeber testified as follows regarding their working relationship, and what it meant for him to be her "supervising physician":

A: Jennifer works under my supervision and I'm—and she is a fully capable practitioner in providing the services that a certified nurse midwife is allowed to perform. And I'm available to help with anything that is beyond her scope, and I'm able to help whenever there's a problem and—and I—I believe that's what my legal responsibility is.

\*     \*     \*

Q: . . . What are the limitations on what a midwife can do, to your knowledge, as someone who supervises midwives?
A: She can take care of women who are coming in for gynecological problems and obstetrical care. In terms of obstetrical care, she can take care

19

of women throughout the course of pregnancy and through labor and delivery.

\* \* \*

Q: Do you have to sign off on orders that are given by the midwife eventually?
A: I have to—I have to review about 20 percent of a midwife's charts and sign off on them.  And orders that are done in the hospital, I ultimately sign off on.
Q: Why do you do that?
A: Because it's required.
Q: By whom?
A: The hospital.

\* \* \*

A: . . . Jennifer is an independent practitioner, and I'm there to support her and supervise her if—when she needs help, I'm there to provide it.
Q: You said two, I think, irreconcilable things.  She's independent or she's under supervision.  Which is it? . . .
A: It's both.  She's allowed to—to take care of pregnant patients within the scope of what she can do. When—when she believes that the scope of what she can do is exceeded or she wants—wants a consult or wants advice or wants me to—or a c-section has to be performed, then she calls upon me.  And it's my job to get there and handle the problem.

Nurse Mercer testified similarly that she is qualified to provide obstetrical care and oversight of a normal vaginal birth without complications.  Dr. Seeber stated that she could order induction of labor, but not a c-section.  Nurse Mercer could not perform a vacuum or forceps delivery, or surgery.  Part of her job is to timely notify and call in the supervising physician if medical complications arise that require a c-section, such as what ultimately happened in this case.  All of the patients of the practice are admitted under the name of the supervising physician, not the certified nurse midwife.

While Defendants are correct in that *Lewis* stands for the proposition that a party defendant may not be compelled to answer questions about the treatment provided by other independent medical professionals "[u]nder the facts of [that] case," *Lewis*, 66 S.W.3d at 888, we are dealing with a different set of facts here.  This is not a scenario featuring co-defendant healthcare providers on an equal footing and at arm's length from one another.  It is undisputed that Dr. Seeber was Nurse Mercer's supervising physician.  As such, Nurse

20

Mercer was not simply 'another healthcare provider' in relation to Dr. Seeber; she was in a subordinate role. In our judgment, the holding of *Lewis* does not extend to circumstances such as these. The ramifications of such an extension would ripple beyond health care liability lawsuits; it could be applied to any field involving expert defendants in a supervisor and supervisee relationship. The results could be absurd and unjust. In this case, adopting Defendants' position with respect to *Lewis* means in practical terms that no one at Caring Choice may be compelled to testify as to whether its employee, Nurse Mercer, complied with the acceptable standard of care. We do not believe *Lewis* stands for this sort of expansive and unjustified expert privilege.

Compelling Dr. Seeber to testify regarding the conduct of his supervisee would not wrongly force him to yield up 'the product of his brain' in contravention of *Lewis* and progeny as he would not be conscripted, as it were, into testifying as an expert to another independent healthcare provider's actions. Instead, it would be more akin to compelling him to testify as to his own conduct, in accordance with *Waterman v. Damp*, as it is Nurse Mercer's conduct as Dr. Seeber's supervisee that gives rise to his liability, if any. The position of "supervisor" is hollow if the supervisor somehow is regarded as utterly walled off from the supervisee. Nurse Mercer either was acting independently or she was not. Under this record, she was not. It would represent an unwarranted extension of *Lewis* to hold that a supervisor who is an "expert" is permitted to choose to testify or not to testify as to certain actions of her own supervisee, including whether the supervisee's actions complied with the acceptable standard of care. As this Court observed in *Waterman*, the purpose of the adverse-party-witness rule is to permit the production of all pertinent and relevant evidence available from the parties in the action. 2006 WL 2872432, at *10. Dr. Seeber's testimony as to Nurse Mercer's conduct would have been highly pertinent and relevant in this matter. The Trial Court erred in expanding *Lewis* to exclude this highly pertinent and relevant evidence based on an erroneous application and extension of the holding in *Lewis* to medical professionals working in a supervisor-supervisee relationship. We hold that the Trial Court committed reversible error in applying *Lewis v. Brooks* to exclude Dr. Seeber's testimony. We reverse the Trial Court as to this issue and remand for a new trial.

The final issue we address is whether the Trial Court erred in excluding proof of Miyona Hyter's pre-majority medical expenses. In *Gardner v. Flowers*, 529 S.W.2d 708 (Tenn. 1975) our Supreme Court articulated a scenario when a minor child may be liable for medical expenses. The High Court stated, in part:

> In this case, according to the stipulated facts, the infant receives her support from a merciful government not from the mother's efforts. Even if the mother had her own means of providing the ordinary needs of the family, it is conceded in the appellee's argument that she has been financially unable

to provide the needed hospital care. Thus, we hold that the infant's situation is that contemplated by the exception to the general rule that an infant has no capacity to make a contract, viz., the infant was destitute of the articles, and had no way of procuring them except by his own contract. The cases from other jurisdictions are almost unanimous in saying, either expressly or by necessary implication, that the parents' inability to provide necessaries to the infant is enough to bind the infant. We agree with what appears to be the majority rule and hold that the inability of parents to pay for essential medical treatment for an infant renders such treatment a necessary for which the infant is liable.

*Gardner*, 529 S.W.2d at 711 (internal citations and quotation marks omitted).

In *Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624 (Tenn. Ct. App. 2017), this Court elaborated on when a minor child may be liable for medical expenses. We stated two separate and distinct causes of action are created when a minor child is injured—a cause of action on behalf of the parent for loss of services and medical expenses to which the parent will be put and a cause of action in favor of the child for the elements of damage to him. *Blackwell*, 523 S.W.3d at 657; *see also* Tenn. Code Ann. § 20-1-105(a) (2009).[2] We concluded: "Son cannot maintain an action for pre-majority medical expenses that were paid or will be paid by his parents. Rather, under the rule in *Wolfe* and *Smith*, Son may only maintain an action for those medical expenses that he paid or is obligated to pay." *Blackwell*, 523 S.W.3d at 663.

In the instant case, Miyona Hyter is a TennCare member and her medical expenses were paid through TennCare. Her support thus came "from a merciful government not from the mother's efforts," 529 S.W.2d at 711, as was the characterization in *Gardner*. In addition, a declaration made under penalty of perjury filed in conjunction with Plaintiff's response to Defendants' motion for partial summary judgment on this issue reflects that BlueCare, which administers TennCare, has asserted its statutory right of reimbursement against Miyona Hyter. Thus, the minor child Miyona Hyter, as a TennCare member, is liable to a subrogation claim. Consequently, under the holdings of *Gardner* and *Blackwell*, Miyona Hyter is personally obligated for her medical expenses. These medical expenses are not "medical expenses that were paid or will be paid by [her] parents." *Blackwell*, 523 S.W.3d at 663. Given this subrogation liability faced by Miyona Hyter, the Trial Court erred in declining to allow her to put on proof of her pre-majority medical expenses incurred because of the alleged negligence of her tortfeasor(s).[3] We reverse the Trial Court

---

[2] "The father and mother of a minor child have equal rights to maintain an action for the expenses and the actual loss of service resulting from an injury to a minor child in the parents' service or living in the family…."

[3] We take no position on the underlying merits of the case.

as to this issue. In a new trial conducted on remand, Plaintiff may put on proof of Miyona Hyter's pre-majority medical expenses.

## **Conclusion**

The judgment of the Trial Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Trial Court for collection of the costs below and for further proceedings consistent with this Opinion, including a new trial. The costs on appeal are assessed to the Appellees, Caring Choice Women's Center, P.C., Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System, Jennifer Mercer, and Michael John Seeber.


  s/ D. Michael Swiney_____
D. MICHAEL SWINEY, CHIEF JUDGE